[Civ. No. 20769.   First Dist., Div. One.   Dec. 18, 1962.]

W. P. FULLER AND COMPANY et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION and FRANK T. CASSIDY, Respondents.

Russ & Moore and John W. Moore for Petitioners.

Everett A. Corten, Rupert A. Pedrin, Neyhart & Grodin and Donald S. Tayer for Respondents.

BRAY, P. J.—Petition by W. P. Fuller and Company and Pacific Employer's Insurance Company for writ of review seeking review and annulment of an award of the commission to Frank T. Cassidy.

### QUESTIONS PRESENTED

1. Was there substantial evidence of an industrial injury in April 1960?

2. Was there substantial evidence to sustain the finding of 66 per cent permanent disability due solely to the series of industrial accidents?

### RECORD.

This proceeding involves a series of industrial injuries to Frank T. Cassidy. The first one occurred in 1946, the second in 1949. No application was ever made to the commission for an award concerning them.[1] During all the times herein mentioned, Cassidy was an employee of W. P. Fuller and Company. On March 30, 1961, Cassidy filed the first application (case No. 195350), alleging an injury to his back in April 1960, when he slipped and fell in the course of his em-

---

[1] As will hereinafter appear, the commission allocated 2/8ths of Cassidy's disability due to industrial injuries to these two injuries, and allowed no compensation therefor.

ployment. On June 8, 1961, five additional applications were filed alleging injuries to his back, on November 20, 1957 (case No. 196025) ; in April 1958 (case No. 196026) ; on November 10, 1958 (case No. 196027) ; on March 20, 1959 (case No. 196028) ; and on February 10, 1960 (case No. 196029).[2]

After hearing, a recommended permanent disability rating was filed based on the referee's instruction as follows: ''Back disability limiting applicant to light to sedentary work.'' Based upon this instruction the Permanent Disability Rating Bureau Commission recommended an overall rating of 66 per cent, due to all the industrial injuries. The commission imposed liability against Fuller in each of the six cases. Upon rehearing the commission corrected its award, and apportioned 2/8ths to State Compensation Insurance Fund for the industrial injuries of November 20, 1957, and April 22, 1958; 1/8th to Pacific Employer's for the industrial injury of November 10, 1958; 3/8ths to Fuller for the industrial injuries of March 20, 1959, February 10, 1960, and April, 1960; and 2/8ths to the 1946 and 1949 injuries for which no application had been filed and for which no award was made.

1. *The April, 1960, Injury.*

Petitioners contend that there was no substantial evidence to support the commission's finding of an injury in April, 1960, and that permanent disability resulted therefrom. In his application for this injury Cassidy alleged that he ''slipped and fell'' and injured his back in April 1960. At the hearing of October 19, 1961, in which the issues were framed, Cassidy's attorney stated that he would like to amend application No. 195350 (the April 1960, injury) ; that ''instead of 'slipped and fell,' Mr. Referee, I believe that should be 'lifting,' or, there is no specific incident alleged in April but Mr. Cassidy did work until April. REFEREE: Well the amendment then relates to the mechanism of injury rather than to the day, you still adhere to the date April, 1960?'' Later the attorney stated that there was not a more specific date of the injury than merely in April.

The only evidence concerning any possible injury in that month was the testimony of Cassidy and the report of Dr. Abrahm. Dr. Abrahm's report states: ''In April,

[2]Pacific Employer's Insurance Company stipulated to insurance coverage for Fuller at the time of the alleged injury in case No. 196027; State Compensation Insurance Fund stipulated to coverage in Nos. 196025 and 196026; Fuller was permissibly self-insured at the time of the injuries in Nos. 196028, 196029 and 195350.

1960, he was unloading a truck when he thinks he threw a 85 lb. case over his head and had severe left low back pain. He again went to a chiropractor who 'straightened his back out', but the pain continued and he went back to the same heavy duty labor that he was doing until April 22, 1960.'' Later in the report the doctor stated: ''. . . all these facts had to be elicited by long questioning and their accuracy fully depends upon the veracity and ability of the patient to know facts and, as stated above, I do not feel that he is able to be very accurate.'' It was further stated: ''I feel that it is important to note that Mr. Cassidy, himself, was working at his regular job when told to lay off by the Company and there was no specific instance of back difficulty according to his history that caused him to leave the job. However, he did state that his back was becoming progressively weaker and he could not do the job as well as formerly, but he, himself, did not request the hospitalization nor was it precipitated by any incident that he knew.''

At the hearing on January 3, 1962, the following occurred with reference to this particular claim: ''MR. MOORE [attorney for Pacific] : Well, that was the case, Mr. Referee, which was originally filed as one case and as I understand from Mr. Tayer, that is more or less of a general claim and the man was, Mr. Cassidy was merely working on that day, there wasn't any specific injury. MR. TAYER [attorney for applicant] : Yes I think it is a general claim for perhaps repeated injuries.'' Subsequently, Cassidy testified in his own behalf, and in reference to the April, 1960, alleged injury, the following transpired (Mr. Tayer was conducting direct examination) : ''Q. And did anything in particular happen around April 22nd or 23rd of 1960? A. Well on the 22nd I'd got pretty well aggravated on unloading again, and reported it. Q. Well, how do you mean you'd gotten pretty well aggravated? A. Well the back got pretty sore on me, from unloading and loading, and the next day they sent me to the Stanford Hospital.'' Cassidy further testified that the foreman gave him notice to report to the hospital; that the foreman knew he had been having back trouble; and that Cassidy talked to the foreman about his back getting pretty sore on the 22nd or 23rd of April, 1960. Stanford Hospital records show that Cassidy was examined there on April 21 by Dr. Beard, and he was admitted into the hospital on April 26. Also the notice to see Dr. Beard could possibly have been for a general checkup, as ''they generally send us to Dr. Hed-

berg . . .'' Further, Cassidy's legs began to bother him about six months before he went to the hospital.

Based upon the above evidence, it was found by the commission that an injury occurred in April 1960, causing permanent disability on April 23, 1960, of 8¼ per cent.

Viewing the above evidence in a manner most favorable to applicant, and having in mind that the commission had the power to reconcile inconsistencies in Cassidy's statements, it is not unreasonable that the commission could draw an inference that an injury did occur in April 1960, while the applicant was loading or unloading his truck. There is a definite conflict of evidence. ██ It is for the commission to resolve all conflicts in the evidence, and although there is a close question of fact here, we cannot upset the finding of the commission merely because it could have found the other way.

██ To constitute an industrial injury, there need not be a blow nor a wrench, as long as the physical condition of the employee is caused by the work he is performing. ''Injury under the California law may also be suffered without the inflicting of a flesh wound or other external trauma. ██ The term is broad enough to cover injuries sustained without the employee's knowledge . . . In fact, the term 'injury' is flexible enough to cover almost any harm-producing incident or exposure in the employment . . .'' (2 Hanna, The Law of Employee Injuries and Workmen's Compensation, p. 131.)

2. *The Rating.*

The referee requested a permanent rating disability from the Permanent Disability Rating Bureau Commission, based on his determination ''Back disability limiting applicant to light to sedentary work. Disability to be apportioned.''

██ Under commission rules where a workman, as here, suffers permanent disability partially due to a condition attributable to disease, and partially due to industrial injuries, the referee has a right to determine, in requesting a permanent disability rating, that the workman has a disability limiting him to ''light to sedentary work.'' Thereupon the rating bureau determines that percentage of permanent disability such limitation constitutes, based upon the bureau's schedule.[3] Under the schedule the basic percentage

---

[3] Under commission rules, the reports of the permanent disability rating staff are deemed to constitute evidence as to the relation between the factors of disability and the percentage of permanent disability, but not as to the existence of such disability.

provided for ''light to sedentary work'' is 60 per cent, but it may be increased due to age and other factors. Here the commission used 66 per cent.[4] The referee determined in requesting the rating, that the entire disability limiting Cassidy to light to sedentary work was due solely to his industrial injuries. He stated in his report that Cassidy's disability above 66 per cent was due to ''other and systemic causes.'' This percentage of disability was then divided, as above set forth, namely, 2/8ths to the industrial injuries of November 20, 1957, and April 22, 1958; 1/8th to the industrial injury of November 10, 1958; 3/8ths to the industrial injuries of March 20, 1959, February 10, 1960, and April 1960; and 2/8ths to the industrial injuries of 1946 and 1949 as to which no application had been filed.

Petitioners contend that in determining a 66 per cent disability due to industrial injuries and only 34 per cent due to disease, the commission disregarded the medical evidence, and that there is no medical evidence to support the commission's finding.[5]

Petitioners do not question the findings of the commission that the claimed industrial injuries occurred other than that of April 1960, which we have heretofore discussed. The question, then, is on what evidence did the commission act in determining that only 34 per cent of Cassidy's disability was due to disease?

Cassidy testified that he received low back injuries in 1946 and again in 1949; that the next five incidents occurred while loading and unloading his truck, at which times his back would ''keep going out on'' him. As to each of the incidents from 1957 through 1959 he received some medical treatment and laid off from work from two to eight weeks. As to the incident of February 1960, his back again went out when a case slipped while loading his truck, from which he lost no time from work but did get treatment from an osteopath a couple of times. He continued to work regularly as a truck driver for Fuller.

Without detailing the evidence of the various doctors who examined Cassidy in 1960 it appears that in addition to the

---

[4]Sixty-five per cent was used for the 1957 and April, 1958 injuries, 66 per cent was used for the later injuries, because of Cassidy's increased age.

[5]No complaint is made as to the percentages allocated to the particular injury, other than that the percentages should have been computed on a basis of seven injuries rather than eight.

results of his industrial injuries Cassidy suffered from osteomalacia and from spondylolisthesis.[6] Dr. Abrahm referred to the condition of Cassidy's spine and pelvis as being due to an extensive involvement caused by Paget's disease, rather than to osteomalacia.

The only doctors who attempted to determine by percentage the relationship of the three conditions ((1) osteomalacia (or Paget's disease), (2) spondylolisthesis, and (3) the industrial injuries) to Cassidy's disability were Dr. Wagner and Dr. Hedberg. Dr. Wagner estimated that the metabolic bone disease was probably 50 per cent responsible for the present disability; the spondylolisthesis 10 per cent; the original industrial injury of 1946 10 per cent; and the other industrial injuries from 1949 through 1960 responsible for the remaining 30 per cent. Dr. Hedberg had treated Cassidy for the original injury of 1946, and his second injury of 1949. He also examined him in December, 1961, at which time the doctor reported that there had been a "progressive deterioration of his general systemic status . . . determined to be of metabolic origin"; that in December, 1961, Cassidy was totally incapacitated for gainful employment "primarily due to the effects of the systemic disease for which injury or work activities are not responsible." Dr. Hedberg believed "the major portion of overall incapacity to be due to general systemic factors having no relation to preexisting spondylolisthesis at the lumbo-sacral level or to the various episodes of low back strain." The doctor would allocate at least 70 per cent of the total disability to nonindustrial injury factors. As to the remaining 30 per cent he would allocate about 1/4th to the spondylolisthesis preexisting at the time of the initial injury in 1946, and would divide the remainder equally between the industrial injuries.

Thus, we have a situation in which all of the medical testimony agrees that Cassidy's disability is due to three factors, (1) the spondylolisthesis, (2) the osteomalacia (or Paget's disease), and (3) industrial injuries. As stated, the only medical testimony which attempted in any way to compare the relative responsibility of each of these factors in causing the disability was that of Dr. Wagner and Dr. Hed-

[6]According to American Illustrated Medical Dictionary by Dorland, pages 1069 and 1414 respectively, osteomalacia is softening of the bones so that they become flexible and brittle; spondylolisthesis is displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum or the fourth lumbar over the fifth.

berg. Dr. Wagner estimated the industrial injuries as being 40 per cent responsible for the disability, Dr. Hedberg about 22-1/2 per cent. Yet the commission placed their responsibility at 66 per cent.

It is the commission's position (and that of the applicant) that where a supervening disease, in concert with traumatic insult to the body of industrial design, results in ascertainable work disability, the question of what percentage is attributable to factors, industrial and nonindustrial, is clearly a question of fact within the province of the trier of fact to distinguish and apply relative weights thereto in assessing liability accordingly.

■ *County of Los Angeles* v. *Industrial Acc. Com.* (1936) 14 Cal.App.2d 134 [57 P.2d 1341], has laid down a rule which, by analogy, would apply here. There the workman had suffered three industrial injuries. The commission found, in substance, that the industrial injuries consisted of "a strain superimposed upon a preexisting arthritis; that the preexisting arthritis and the three injuries resulted in" permanent disability. (Pp. 135-136.) The commission made an apportionment between the preexisting arthritis and the several injuries. The petitioner contended that the commission was not justified in making such apportionment. The court held (p. 136): "The determination of the percentage of disability is a matter left to the sound discretion of the Commission," citing *Hines* v. *Industrial Acc. Com.* (1932) 215 Cal. 177 [8 P.2d 1021].

The *Hines* case stated that the determination of the percentage of disability "is, of course, left to the sound discretion of the Commission to be exercised in view of all the circumstances." (P. 188.) *Hines,* in turn, cited *Ford Motor Co.* v. *Industrial Acc. Com.* (1927) 202 Cal. 459, 464 [262 P. 466], which stated that the determination of the percentage of disability is "a matter within the exclusive jurisdiction of the Commission, and this court has no power to disturb such action provided there was any evidence before the Commission to justify such a finding."

In *County of Los Angeles, supra,* the petitioner made the additional contention that there was no evidence to justify the commission's finding of permanent disability, for the reason that the permanency was not established by medical testimony, and that the commission could not make such a finding without expert testimony. Although there was lay and expert testimony as to the workman's physical condition, "No physi-

cian was asked the question whether in his opinion the injuries were permanent." (P. 137.) The court held: "The determination of the question whether petitioner suffered permanent injuries must be made by the Commission and the decision of the Commission is final and conclusive. The question presented is one purely of fact. *(Hart* v. *Industrial Acc. Com.,* 119 Cal.App. 200 [6 P.2d 348].) . . .

"No case has been cited to us in which it is held that the precise question whether an injury is permanent must be asked of a physician or surgeon. Nor has any case been cited in which it has been held that the Commission cannot under any circumstances make a finding that an injury is permanent without the evidence of experts. . . . The officials of the Commission with their great experience in handling matters involving injuries to workmen are of necessity better qualified than the average layman to pass upon such questions. Indeed, the argument in favor of the necessity for expert testimony in cases where the injury is claimed to be permanent might be made with like effect in cases of temporary total disability. If the contention of petitioner should be upheld and carried to its logical conclusion the result would follow that expert witnesses would be necessary in all cases. If the legislature had not intended to place with the Commission the determination of such questions it doubtless would have made expert testimony a prerequisite to the making of an award." (Pp. 137-138.)

By analogy, if the commission may determine the question of permanency of injuries from evidence concerning the applicant's physical condition, without aid of expert testimony, there does not seem to be any reason why, where, as here, lay and medical evidence is given of applicant's physical condition arising from his industrial injuries and from systemic disease or condition, the commission from its vast experience may not determine the percentage of disability due to the industrial injuries and that due to the other causes, without the necessity of medical experts expressing percentages.

The evidence here clearly shows that Cassidy's metabolic bone disease, which had not been disabling in any way prior to 1960, caused rapid deterioration subsequent to his last injury (it is conceded that Cassidy's overall condition, which in 1961 was testified as permitting light to sedentary work, is now totally and permanently disabling).

Section 4660, Labor Code, provides: "(a) In determining

the percentages of permanent disability, account shall be taken of the nature of the physical injury . . ., the occupation of the injured employee, and his age at the time of such injury, consideration being given to the diminished ability of such injured employee to compete in an open labor market.''

Subdivision (b) of that section provides that the commission may adopt a schedule for the determination of the percentage of permanent disabilities which schedule ''shall be prima facie evidence of the percentage of permanent disability to be attributed to each injury . . .'' It was under such a schedule that the commission determined that the limitation to ''light to sedentary work'' constituted a 66 per cent disability. The commission then made its determination that the industrial injuries sustained by Cassidy caused such limitation and that his systemic condition was responsible for his disability beyond that percentage. The effect of the commission's determination is that Cassidy's disability due to industrial injuries became permanent as of the date of his last injury. His deterioration thereafter is due to his metabolic bone disease.

Undoubtedly the determination in a situation of this kind as to what percentage of disability is chargeable to injury and what to disease is a difficult one. However, even though Dr. Reaven states ''The group of diseases, of which Mr. Cassidy is an example, is not well understood,'' it is not of a type ''where the truth is occult and can be found only by resorting to the sciences'' *(State Compensation Ins. Fund v. Industrial Acc. Com.* (1924) 195 Cal. 174 [231 P. 996]), and hence requiring expert testimony, other than as to the actual condition of the workman and the causes of such condition.

In *Tanenbaum v. Industrial Acc. Com.* (1935) 4 Cal.2d 615, 618 [52 P.2d 215], the court said: ''It is apparent that the apportionment here made is even more favorable to petitioner than is warranted by the medical report first above quoted. However, it is settled that the determination of the percentage of disability is a matter left to the sound discretion of the commission.''

*William Simpson Constr. Co. v. Industrial Acc. Com.* (1925) 74 Cal.App. 239 [240 P. 58], is not in point. There the employee fell from a scaffold. No one witnessed the fall. Two doctors testified that an autopsy of the skull disclosed a subdural hemorrhage caused by a stroke of apoplexy as well as

a fracture of the skull. The doctors testified that in their opinion the stroke preceded the fall. There was no testimony to the contrary. The court held that the question of what caused the death was a matter with which only medical men would be familiar, and hence the commission had no power to disregard the only medical testimony and " '. . . upon surmise, speculation and conjecture . . .' " determine the cause of death. (P. 246.) We have no such situation here.

▇▇▇▇ The evidence in this case clearly shows Cassidy's condition resulted from his injuries and from the other causes. Based upon its experience in relating physical condition to ability to work, the commission was in equally as good position to evaluate percentages of disability arising from those conditions as the medical men. We cannot say that its determination was not reasonable under all the circumstances.

▇▇▇▇ As to the spondylolisthesis, the evidence demonstrates that it had not caused any disability over the years. The commission determined that the preexisting spondylolisthesis was aggravated by the injuries, prior to which no disability from it had occurred. No apportionment is indicated because industry takes the man as he is. The commission was correct in this respect.

The award is affirmed.

Sullivan, J., and Molinari, J., concurred.

Petitioners' application for a hearing by the Supreme Court was denied February 13, 1963.