[Civ. No. 11648. Fourth Dist., Div. Two. Mar. 31, 1972.]

J. M. MOYER, Petitioner, v.
WORKMEN'S COMPENSATION APPEALS BOARD and
SUBSEQUENT INJURIES FUND, Respondents.

652

COUNSEL

Byhower, Longley & Petherbridge and Nicholas C. Byhower for Petitioner.

Evelle J. Younger, Attorney General, Melvin R. Segal, Deputy Attorney General, Rupert A. Pedrin and Stanley S. Feinstein for Respondents.

OPINION

KAUFMAN, J.—Petitioner (hereinafter Applicant) seeks review of an order of the Workmen's Compensation Appeals Board (hereinafter Board)

denying reconsideration of a referee's order denying recovery of compensation from the Subsequent Injuries Fund (hereinafter Fund).

### Procedural Facts

On September 5, 1969, Applicant made application for workmen's compensation benefits from his employer, alleging an industrial injury to his heart on October 18, 1968. On December 24, 1969, Applicant, his employer and its insurance carrier filed a compromise and release dated December 18, 1969, proposing to settle Applicant's claim for $12,000. The compromise and release recited that it was made "[d]ue to the contested issues herein, namely, nature, extent and duration of disability, apportionment, prejudice for lack of notice, injury AOE/COE, and in order to avoid the hazards, delays and uncertainties of further litigation . . . ." On January 12, 1970, the compromise and release was approved by order of the Board.

Meanwhile, on November 14, 1969, Applicant filed an application for additional benefits from the Subsequent Injuries Fund pursuant to Labor Code, sections 4751 through 4755. It was alleged in substance that, prior to the industrial injury of October 18, 1968, Applicant was permanently partially disabled by virtue of "[a]rterial hypertension, enlarged heart and ischemic heart disease."

Although the application for additional benefits alleged no preexisting hearing loss, when the parties appeared on March 2, 1970, for hearing, Applicant was referred, by agreement of the parties, to Dr. Harold V. Kahn, an ear specialist, as an independent medical examiner.

The application for additional benefits came on for hearing December 8, 1970. A report from Dr. Kahn, the ear specialist, dated May 19, 1970, was received in evidence without objection. Also received into evidence were a medical report by Dr. MacKay, an examining physician, dated October 24, 1969, a letter of correction from Dr. MacKay dated November 6, 1969, and several medical reports by Dr. Lonergan, Applicant's treating physician. Dr. Lonergan was also cross-examined on his reports.

On April 28, 1971, the referee issued his findings and order in respect to the application for additional compensation. He found that the industrial injury on October 18, 1968, resulted in permanent disability of 100 percent; that "[t]here is no apportionment"; and that there was no liability on the part of the Fund. Accordingly, it was ordered that Applicant take nothing.

Applicant filed a timely petition for reconsideration alleging, in substance, that the evidence established that a portion of his disability was

attributable to preexisting cardiovascular disease and hearing loss and that, therefore, the findings of "no apportionment" and that the Fund was not liable were erroneous and that, additionally, the referee had erred in failing to award Applicant reimbursement for medical-legal costs.

On July 2, 1971, the Board made its order denying the petition for reconsideration and adopting, as its statement of the reasons and evidence relied on, the report of the referee. The report of the referee dated May 26, 1971, rejected Applicant's several contentions. With respect to the failure to award medical-legal costs, the report points out that Applicant offered no evidence of unreimbursed medical-legal costs before the case was submitted. With respect to the hearing loss the report states: "[T]here was no pleading against the Subsequent Injuries Fund for hearing loss. However, since the man is totally disabled because of his heart, it is inconsistent that he can be also disabled because of a hearing loss." With respect to the claimed preexisting disability on account of cardiovascular disease, the report, after referring to certain testimony of Applicant and of Dr. Lonergan and Dr. Lonergan's medical report dated January 11, 1968, concludes that a preexisting permanent partial disability under Labor Code, section 4751 "must be labor disabling which means to the Referee there must be something interfering with the applicant's ability to work. [¶] [A]pplicant has only established that he had prior pathology and not disability."

Under date of August 6, 1970, Applicant's attorney had obtained a written informal advisory rating of certain of the medical reports. It showed that Dr. Lonergan's report of July 17, 1970, would support a preexisting heart disability rated at 42 percent; that Dr. Kahn's report of May 19, 1970, would support a preexisting hearing loss rated at 33 percent; and that the combined preexisting heart and ear conditions would rate 64½ percent.

### Preliminary Considerations

■ Since the Board adopted the report of the referee in its order denying reconsideration, the evidence relied upon and the reasons for decision as stated in the report of the referee are considered those of the Board. (Lab. Code, § 5908.5; *LeVesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627, 633-635 [83 Cal.Rptr. 208, 463 P.2d 432].)

Labor Code, section 4751, under which the application for additional benefits was brought, requires as a prerequisite to Fund liability that the employee be "permanently partially disabled" prior to his subsequent industrial injury. Technically speaking, therefore, the issue in this proceeding between Applicant and the Fund was whether he was "permanently partially disabled" prior to his industrial injury on October 18, 1968, not whether

liability for the disability resulting from the injury of October 18, 1968, should be "apportioned." The issue of apportionment is germane to proceedings between an employee and his employer and its insurance carrier. (See Lab. Code, §§ 4663, 4750.) Technically speaking, therefore, the decision of the referee was not supported by the findings inasmuch as there was no express finding that Applicant was not "permanently partially disabled" prior to the injury of October 18, 1968. Nevertheless, in the context of claimed successive disablements, the issues of apportionment and preexisting permanent partial disability are correlative. ■ If the employer is liable for the entire disability, the Fund should not also be liable. (See *State Compensation Ins. Fund* v. *Industrial Acc. Com.*, 59 Cal. 2d. 45, 55 [27 Cal.Rptr. 702, 377 P.2d 902]; *Ferguson* v. *Industrial Acc. Com.*, 50 Cal.2d 469, 477 [326 P.2d 145].) Furthermore, it is clear from the report of the referee adopted by the Board that, as to the claimed preexisting cardiovascular disability, the basis of decision was that there was no preexisting permanent partial disability, and the parties have apparently treated the referee's "no apportionment" finding as a finding that there was no preexisting permanent partial disability. Therefore, so shall we.

### Preexisting Hearing Loss

■ The evidence, consisting of Applicant's testimony and the report of Dr. Kahn dated May 19, 1970, conclusively establishes a preexisting hearing loss ratable at 33 percent. Clearly, this constitutes a preexisting permanent partial disability within the meaning of Labor Code, section 4751. (*Subsequent Injuries Fund* v. *Industrial Acc. Com.*, 56 Cal.2d 842, 845-846 [17 Cal.Rptr. 144, 366 P.2d 496].) Liability of the Fund on this basis was rejected by the Board for two reasons: that the preexisting hearing loss was not alleged in the application and that, inasmuch as the industrial heart injury of October 18, 1968, rated 100 percent, consideration of the hearing loss was, in any event, precluded. Neither reason is sound.

■ Even in a civil case, when an issue has been consciously tried by the parties without objection, it is properly before the court for adjudication even though not formally raised by the pleadings. (*Freeman* v. *Gray-Cowan, Inc.*, 219 Cal. 85, 87 [25 P.2d 415]; *Crescent Lumber Co.* v. *Larson,* 166 Cal. 168, 171 [135 P. 502]; 4 Witkin, Cal. Procedure (2d ed. 1971) p. 3138.) In a workmen's compensation proceeding, in which much less formal rules of pleading are observed, the rule should be at least as liberal. (Cf. *Helmuth* v. *Industrial Acc. Com.*, 59 Cal.App. 160, 162 [210 P. 428].) ■ Although the preexisting hearing loss was not alleged in the application, when the parties appeared for hearing on March 2, 1970, Applicant was referred to an ear specialist by agreement of the

parties, and the report of the doctor was subsequently received into evidence without objection. The hearing loss issue was, therefore, before the Board.

■    The reasoning that consideration of the hearing loss was precluded because the heart disability rated 100 percent is based upon the mistaken notion that a 100 percent disability rating is the equivalent of actual total disability insofar as productive work or compensated employment is concerned. (See *State Compensation Ins. Fund* v. *Industrial Acc. Com., supra,* 59 Cal.2d at pp. 51-53; *Smith* v. *Industrial Acc. Com.,* 44 Cal.2d 364, 367-370 [282 P.2d 64]; *Dahlbeck* v. *Industrial Acc. Com.,* 135 Cal.App. 2d 394, 403-404 [287 P.2d 353].)    ■    The words "permanent disability" encompass not only impairment of the normal use of a portion of the body but, also, impairment of earning capacity and the diminished ability of the injured employee to compete in an open labor market. (Lab. Code, § 4660, subd. (a); *State Compensation Ins. Fund* v. *Industrial Acc. Com., supra,* 59 Cal.2d at pp. 52-53; *Subsequent Injuries Fund* v. *Industrial Acc. Com., supra,* 56 Cal.2d at pp. 845-846; *Smith* v. *Industrial Acc. Com., supra,* 44 Cal.2d at pp. 367-370.)    ■    If successive injuries produce separate and independent diminutions in the ability of the injured employee to compete in an open labor market "then each is properly rated separately without concern for the theoretical 100 per cent assigned to 'total' disability," and each may be considered in determining liability of the Subsequent Injuries Fund under Labor Code, section 4751. (*State Compensation Ins. Fund* v. *Industrial Acc. Com., supra,* 59 Cal.2d at p. 53; *Smith* v. *Industrial Acc. Com., supra,* 44 Cal.2d at p. 370.)    ■    There can be no question but what Applicant's preexisting hearing loss would, independently of his heart disability, impair his earning capacity and diminish his ability to compete in an open labor market.

*Preexisting Cardiovascular Disability*

The evidence conclusively shows that on October 18, 1968, while engaged in physical activity in the performance of his work, Applicant suffered a heart attack (myocardial infarction) and that since that time he has been 100 percent disabled for rating purposes. Applicant's claim that he was previously "permanently partially disabled" within the meaning of Labor Code, section 4751 by virtue of cardiovascular disease was as previously noted rejected by the referee whose report was adopted by the Board. The evidence relied upon by the referee was solely portions of the testimony of Applicant, portions of Dr. Lonergan's medical report dated January 11, 1968, and one statement in the testimony of Dr. Lonergan on cross-examination. The referee reported: "Before this injury [heart attack on

October 18, 1968], the applicant had contacted Dr. T. Lonergan because of stomach problems. The doctor advised him in his report that he had some angina pectoris. The doctor then stated, 'the physical examination was within normal limitations . . . It is essential that you keep active and continue to work . . . it would be well for you to continue your regular level of physical work . . .'

"The applicant testified he worked at Hutcheson's Paint and Body Works for 9 years before the injury and to his knowledge lost no time from work because of his heart trouble. Dr. Lonergan testified on December 8, 1970 [transcript reference omitted] that the applicant was not disabled from work because of his heart. . . . In the words of Dr. Lonergan, he was '. . . prone to heart attacks . . .' "

Based on the foregoing evidence, the referee's report reasoned: "Labor Code Sections 4750 through 4755 state the basic conditions in order to establish liability against the Subsequent Injuries Fund. In particular, there must be a showing that the employee had in existence a permanent partial disability prior to the Subsequent Injuries compensable injury. The case of the *Subsequent Injuries Fund vs. Baldes,* 25 CCC 10 established that the disability must be labor disabling which means to the referee there must be something interfering with the applicant's ability to work. [¶] . . . . Therefore, it is concluded the applicant has only established that he had prior pathology and not disability."

■ It is correct that in order to constitute a permanent partial disability within the meaning of Labor Code, section 4751 a preexisting injury, condition or disease must have been "labor disabling." (*Subsequent Injuries Fund* v. *Industrial Acc. Com., supra,* 56 Cal.2d at p. 845; *Ferguson* v. *Industrial Acc. Com., supra,* 50 Cal.2d at p. 477.) It is not correct that it must have interfered with the employee's ability to work at his employment in the particular field in which he was working at the time of his subsequent injury. (*Subsequent Injuries Fund* v. *Industrial Acc. Com., supra,* 56 Cal.2d at pp. 845-846; *Ferguson* v. *Industrial Acc. Com., supra,* 50 Cal.2d at p. 477.) As previously noted, impairment of earning capacity or diminished ability to compete in an open labor market constitutes disability. (Lab. Code, § 4660, subd. (a), *supra*; *State Compensation Ins. Fund* v. *Industrial Acc. Com., supra,* 59 Cal.2d at pp. 52-53; *Subsequent Injuries Fund* v. *Industrial Acc. Com., supra,* 56 Cal.2d at pp. 845-846; *Smith* v. *Industrial Acc. Com., supra,* 44 Cal.2d at pp. 367-370.) It is apparent, therefore, that the referee's reasoning adopted by the Board was based on a misconception of the applicable law, and, under correct legal principles, upon the entire record, the determination that Applicant's preexisting cardiovascular condition was not a permanent partial disability

within the meaning of Labor Code, section 4751 is not supported by substantial evidence. (Lab. Code, § 5952; *LeVesque* v. *Workmen's Comp. App. Bd., supra,* 1 Cal.3d at p. 637.)

The medical evidence indisputably establishes that, prior to his heart attack on October 18, 1968, Applicant was suffering from cardiovascular disease. Dr. Lonergan classified the condition as "atypical angina pectoris." Dr. MacKay noted "underlying ischemic heart disease" and "arterial hypertension." ▉ Although not conclusive upon the Board (cf. *Zemke* v. *Workmen's Comp. App. Bd.,* 68 Cal.2d 794, 798-799 [69 Cal.Rptr. 88, 441 P.2d 928]; *W. P. Fuller & Co.* v. *Industrial Acc. Com.,* 211 Cal. App.2d 9, 16, 18, 20 [27 Cal.Rptr. 401]), both doctors suggested the propriety of attributing a portion of Applicant's disability to his preexisting condition. Thus, there is no question of the existence of the prior condition. The question is whether, because of it, Applicant was "permanently partially disabled" within the meaning of Labor Code, section 4751.

It is true as reported by the referee that, in Dr. Lonergan's report of January 11, 1968, it was stated that the physical examination (apparently on July 3, 1967) was within normal limits. The referee omitted from his report, however, a rather essential word. Dr. Lonergan's complete statement was: "The physical examination *itself* was within normal limits." (Italics supplied.) It is perfectly clear that the statement was meant to refer to the physical examination alone. The report discloses that X-rays and other tests had shown an enlarged heart and minor intermittent cardiospasm, and that Dr. Lonergan concluded that the pain which Applicant had been experiencing was attributable to Applicant's heart condition.

It is also true as reported by the referee that Dr. Lonergan advised Applicant to continue working, that Applicant did continue working and lost no time from work because of his heart trouble. However, it is perfectly clear from Dr. Lonergan's report of January 11, 1968, and his testimony that Dr. Lonergan advised Applicant to continue work as therapy *because* of his condition. ▉ More importantly, it is not necessary to establish preexisting permanent partial disability that the employee lost time from work or had reduced earnings because of his condition. (*Subsequent Injuries Fund* v. *Industrial Acc. Com., supra,* 56 Cal.2d at p. 845; *Ferguson* v. *Industrial Acc. Com., supra,* 50 Cal.2d at p. 477; *Smith* v. *Industrial Acc. Com., supra,* 44 Cal.2d at p. 367.) It is sufficient that the preexisting condition or disease has resulted in impairment of earning capacity or diminished ability to compete in an open labor market. (Lab. Code, § 4660, subd. (a), *supra; State Compensation Ins. Fund* v. *Industrial Acc. Com., supra,* 59 Cal.2d at pp. 52-53; *Subsequent Injuries Fund* v. *Indus-*

*trial Acc. Com., supra,* 56 Cal.2d at pp. 845-846; *Smith* v. *Industrial Acc. Com., supra,* 44 Cal.2d at pp. 367-370.)

It is also true as reported by the referee that Applicant was not disabled from work because of his heart condition. Again, however, Dr. Lonergan's full statement is revealing. He was asked whether, when he wrote his report dated January 11, 1968, Applicant "was disabled from a heart standpoint." He responded: "No. I don't know what you mean by disabled. I am sorry, but as far as working—no." Of course, as previously pointed out, actual disability in the sense that an employee is unable to perform the duties of his existing employment is not required to establish permanent partial disability within the meaning of Labor Code, section 4751. ██ Thus, Dr. Lonergan's statement that Applicant was not disabled from work by his preexisting heart condition does not constitute substantial evidence that he was not "permanently partially disabled" within the meaning of Labor Code, section 4751. Moreover, Dr. Lonergan expressly disavowed knowledge of what is meant legally by the term disabled, and his testimony as a whole is persuasive he was not aware that disability for workmen's compensation purposes can encompass impairment of earning capacity or diminution of ability to compete in an open labor market.[1] ██ The testimony of a medical expert based on an incorrect legal theory or extending beyond the range of his expertise does not constitute substantial evidence. (*Zemke* v. *Workmen's Comp. App. Bd., supra,* 68 Cal.2d at pp. 798-799; 1 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed.) § 10.08[2] [b] [ii].)

██ Respondents rely upon a number of apportionment cases holding that an employer is liable for all of the disability resulting from the aggravation or lighting up of a preexistent dormant or asymptomatic condition or disease.[2] (E.g., *Berry* v. *Workmen's Comp. App. Bd.,* 68 Cal.2d

[1]In answer to a previous question as to what he meant by "totally disabled," Dr. Lonergan answered: "Not being acquainted with all the terminology used by the Workmen's Compensation setup, I would have to say from a medical standpoint totally disabled would mean that he was incapable of gainful employment, incapable of gainful employment because of his disability." As previously noted, total disability for rating purposes is not the equivalent of actual total disability for productive work or compensated employment. (See *State Compensation Ins. Fund* v. *Industrial Acc. Com., supra,* 59 Cal.2d at pp. 51-53; *Smith* v. *Industrial Acc. Com., supra,* 44 Cal.2d at pp. 367-370; *Dahlbeck* v. *Industrial Acc. Com., supra,* 135 Cal.App.2d at pp. 403-404.)

[2]As previously indicated, the issues of apportionment of liability in respect to the employer is correlative to the issue of liability of the Fund, because the Fund should not be liable for a portion of the disability if the employer is liable for the entire disability. (See *State Compensation Ins. Fund* v. *Industrial Acc. Com., supra,* 59 Cal.2d at p. 55; *Ferguson* v. *Industrial Acc. Com., supra,* 50 Cal.2d at p. 477.)

786, 789 [69 Cal.Rptr. 68, 441 P.2d 908]; *Argonaut Ins. Co. v. Industrial Acc. Com.,* 57 Cal.2d 589, 592-593 [21 Cal.Rptr. 545, 371 P.2d 281].) The rule stated is, of course, correct, but it is not applicable to the case at bench in which the uncontradicted evidence establishes that Applicant's preexisting heart condition was neither dormant nor asymptomatic.

Applicant was a body and fender mechanic whose work frequently required that he get underneath a vehicle lying on his back on a creeper and work overhead. Dr. Lonergan's report of January 11, 1968, indicates that the reason Applicant consulted him was because of a pain in his abdomen and pain in the back and shoulders when Applicant would attempt to do such work after eating. The report recites that Applicant first consulted Dr. Lonergan in 1966 and again saw him on July 3 and December 21, 1967, each time complaining of the aforementioned pain. On cross-examination Dr. Lonergan testified that, although he had recommended to Applicant that he continue working, he had advised him to "stop whatever he was doing" when the pain occurred. Appellant testified without contradiction that the pain affected him in his work. "I couldn't lie down on a creeper and work overhead very well because it is too much pain." "It caused my arms to ache an awful lot. I had to call for help. I couldn't handle the thing by myself as a rule." In his medical report dated July 17, 1970, Dr. Lonergan stated: "It would be my opinion that just prior to the job injury 10/18/68, Mr. Moyer's work capacity was a disability precluding heavy work. I would classify his pain and discomfort during the period immediately before the job injury as moderate." When asked to explain this statement in light of his recommendation to Applicant to continue working and his testimony that Applicant was not disabled from working by the preexisting heart condition, Dr. Lonergan explained that Applicant had assured him he could have help on the job and that "he would quit when the pain became noticeable." "In order to develop collateral circulation they have to keep busy. He had no evidence of an infarct, and since he had a boss who was apparently understanding and he could get help that he should continue because often times these people can overcome this circulatory insufficiency to the point where collateral circulation has developed."

The determination in a case such as this whether an employee's present disability is attributable solely to a subsequent industrial injury or is attributable in part to a preexisting permanent partial disability involves, in reality, a balancing of two competing public policies, both of which are important to workmen's compensation law. One is the fundamental policy upon which the workmen's compensation system is founded that industry and thus, ultimately, the consumer shall bear the economic cost of disability to workmen resulting from risks incident to the production of goods

or services. (See 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed.) § 1.05[2]; 1 Larson, Workmen's Compensation Law (1968) § 2.20; Cal. Workmen's Compensation Practice (Cont. Ed. Bar 1963) § 1.3; see also *Hinman* v. *Westinghouse Elec. Co.*, 2 Cal.3d 956, 962, fn. 3 [88 Cal.Rptr. 188, 471 P.2d 988].) The second is the policy underlying the establishment of the Subsequent Injuries Fund, to wit, that industry be encouraged to employ or retain in employment persons who have some permanent partial disability. (See *State Compensation Ins. Fund* v. *Industrial Acc. Com., supra*, 59 Cal.2d at p. 49; *Dow Chemical Co.* v. *Workmen's Comp. App. Bd.*, 67 Cal.2d 483, 493 [62 Cal. Rptr. 757, 432 P.2d 365]; *Ferguson* v. *Industrial Acc. Com., supra*, 50 Cal.2d at p. 475.)[3]

In reconciliation of these competing policy considerations, it has been noted that ". . . to apply the provision for preexisting permanent partial disability [Lab. Code, § 4751] to more than easily recognizable permanent objective disabilities would convert the Subsequent Injuries Law into a state health insurance plan, applicable only to one class, the employed." (*Ferguson* v. *Industrial Acc. Com., supra*, 50 Cal.2d at p. 476; *Subsequent Injuries Fund* v. *Industrial Acc. Com., supra*, 56 Cal.2d at p. 846.) Thus it is stated that if the alleged preexisting disability is not reflected in loss of bodily function or loss of actual earnings, ". . . it should at least be of a kind which could ground an award of permanent partial disability." (*Ferguson* v. *Industrial Acc. Com., supra*, 50 Cal.2d at p. 477; *Subsequent Injuries Fund* v. *Industrial Acc. Com., supra*, 56 Cal.2d at p. 845; 2 Larson, Workmen's Compensation Law (1970) § 59.32, p. 88.126.)

Prior to his heart attack on October 18, 1968, Applicant's cardiovascular condition, being symptomatic and causing him pain in the performance of his duties, impaired his earning capacity and diminished his ability to compete in an open labor market, and we are satisfied it would have constituted a ratable disability if industrially caused. (See *State Comp. Ins. Fund* v. *Industrial Acc. Com.*, 56 Cal.2d 681, 683 [16 Cal.Rptr. 359, 365 P.2d 415].) Moreover, of the two competing public policies mentioned above, it is the policy of encouraging industry to employ or retain partially disabled workmen that must prevail in this case. As previously set forth, the evidence indicates that Applicant's preexisting cardiovascular condition was symptomatic and was interfering in some measure with Applicant's performance of his duties. The evidence strongly suggests that his employer

---

[3]There may also be involved a policy of encouraging partially disabled persons to seek or retain employment. (See *Dow Chemical Co.* v. *Workmen's Comp. App. Bd., supra*, 67 Cal.2d at p. 494; *Ferguson* v. *Industrial Acc. Com., supra*, 50 Cal.2d at p. 475.)

knew of Applicant's difficulties but nevertheless retained him in employment. If an employer is to be held liable under these circumstances for the full disability resulting from a subsequent heart attack, industry would be motivated to discharge an employee at the first sign of developing cardiovascular disability. It is precisely this that the Subsequent Injuries Law was meant to prevent.

Our conclusions herein are not in conflict with the decision in *Brown* v. *Workmen's Comp. Appeals Bd.*, 20 Cal.App.3d 903 [98 Cal.Rptr. 96]. In that emphysema case the court noted that there was no compensable injury until the disability became apparent (20 Cal.App.3d at p. 912); that the employer should have been liable for the entire disability, either under the special provisions of Labor Code, section 5500.5 or under the theory of aggravation or lighting up of a preexisting nondisabling condition (20 Cal.App.3d at pp. 912-914); and that by making an improvident settlement with the employer, the employee was attempting to impose upon the Subsequent Injuries Fund a liability rightfully that of the employer (20 Cal.App.3d at pp. 910-911). In the case under review Applicant's preexisting cardiovascular condition did constitute a permanent partial disability within the meaning of Labor Code, section 4751; the employer should not have been liable for Applicant's entire disability; and the compromise and release entered between Applicant and his employer was properly made and does not constitute an attempt to shift to the Subsequent Injuries Fund a liability rightfully that of the employer.

In view of our conclusions, it is unnecessary to deal with Applicant's contention that the Board (and presumably the Fund) were somehow bound by the order approving the compromise and release. With respect to the failure of the Board to award medical-legal costs, it was, of course, incumbent upon the Applicant to present evidence of such expense at the hearing. In view of the fact that the present order must be annulled, we trust that the matter of medical-legal costs can be satisfactorily adjusted in subsequent proceedings.

The order denying reconsideration and the decision on the application for additional compensation under Labor Code, sections 4751 through 4755 are annulled and the case is remanded to the Board for further proceedings consistent with this opinion.

Gardner, P. J., and Kerrigan, J., concurred.

A petition for a rehearing was denied April 18, 1972.