[Civ. No. 33246. Second Dist., Div. Four. Feb. 20, 1969.]

RAY SKINNER, Petitioner, v. WORKMEN'S COMPEN-
SATION APPEALS BOARD, CITY OF REDONDO
BEACH et al., Respondents.

Steven Roseman for Petitioner.

Everett A. Corten, Sheldon C. Ziff, T. Groezinger, Loton
Wells and G. K. Bogue for Respondents.

WAPNER, J. pro tem.*—An applicant seeks review and
annulment of an award made by the Workmen's Compensa-
tion Appeals Board after reconsideration.

A referee issued an award based on findings that applicant,

*Assigned by the Chairman of the Judicial Council.

born March 7, 1925, sustained a cumulative industrial injury to his nervous system while employed from August 6, 1963, through July 28, 1967, as an electrician leadman for the City of Redondo Beach; that the injury caused temporary disability from July 29 through October 10, 1967, and permanent disability of 60 percent (rated on the factor "moderate neurosis") and that medical treatment as prescribed by Dr. Brody in a report dated November 15, 1967, was required to cure or relieve from the effects of the injury. On granting defendants' petition for reconsideration the appeals board found that 75 percent of the applicant's permanent disability was attributable to "non-industrially related illness" and reduced the award of permanent disability to 15 percent, after apportionment.

 Applicant contends that there is no legal basis for apportionment and the evidence compels a finding that further medical treatment is required.

The decision of the appeals board states:

"We have carefully reviewed the record in this matter. We are persuaded by the report of Dr. Laurence S. Brody of November 15, 1967, in which Dr. Brody states that a realistic figure as to the causation of applicant's disability would be 25% to industrially related illness and 75% to non-industrially related illness, that there should be an apportionment of 25% of applicant's permanent disability to his industrially caused injury and the remainder should be apportioned to his pre-existing condition."

The record reflects applicant had served 21 years in the United States Navy, the last 10 as a chief petty officer with as many as 50 men under his command. Upon retirement from the Navy he went to work for the City of Redondo Beach on August 6, 1963, as an electrician. He worked under a very demanding supervisor. He became a leadman and approximately two months later, after a week of unusual stress at work and in the course of an incident with his supervisor, on July 28, 1967, he became emotionally disturbed at his place of employment. He was disabled from July 29, 1967, through October 10, 1967, and required psychiatric care for mental illness. At the hearing of his claim the defendants admitted the industrial injury. Applicant testified that he had never had any emotional disturbances and was never treated by a psychiatrist prior to the injury. There was no medical history or evidence of any kind that applicant had ever previously manifested any type of abnormal mental condition or illness.

The medical evidence is comprised of the reports of two doctors. Both doctors agree that applicant's ability to tolerate stress is now severely impaired and he is subject to acute psychotic reaction in any stressful situation.

Dr. Brody had a consultation with applicant on November 10, 1967, and reviewed the reports of an insurance investigator, the city police department, and medical records, including a report dated October 13, 1967, of Dr. Wallace. In his report of November 15, 1967, Dr. Brody described applicant as extremely agitated, shaky, tremulous, argumentative, belligerent, suspicious, potentially dangerous and volatile, and diagnosed his condition as a paranoid state possibly representing either a chronic paranoid schizophrenic reaction in a state of marginal compensation or some sort of borderline psychotic state with paranoid tendencies and moderate acute depressive reaction. The report further states in pertinent parts:

". . . I feel Mr. Skinner's psychiatric problems are *probably* longstanding. He strikes me as a very brittle, fragile man psychologically who may function at a marginally psychotic level. This condition is a tentative diagnosis and I feel that possibly this condition was aggravated by promotion approximately sixty days prior to the incident. In addition, there is no question that there was some personality problem conflict between Mr. Skinner and Mr. Renke. I would estimate that probably Mr. Skinner's condition (acute psychotic reaction of July 28, 1967) was caused possibly by his underlying condition compounded with the acute stress of that week.

". . . Mr. Skinner has filed an application alleging that his problem was totally caused by employment within the City of Redondo Beach. I do not believe that this is entirely acceptable because of the grossness and massive proportions of his disability.

". . . . . . . . . . . . . . . .

"I think that Mr. Skinner has been latently psychotic and probably this would have been entirely undetected if the stress of the responsibility of lead man had not been imposed on his [*sic*] plus the added stress of being 'forced' to take the weekend call. I think that probably a realistic figure would be 25% industrially related illness and 75% nonindustrially related illness. . . .

"I would strongly recommend perusal of Mr. Skinner's medical records in military service to see if there was any evidence of psychiatric disability. It should be mentioned that this could have been masked because of the structured nature

of military duties. I furthermore think that psychological testing would be helpful, because I would predict, that a picture of a paranoid psychotic state would be raised as a possibility.''

Dr. Wallace, the treating psychiatrist, expressed the opinion that work stress caused applicant's total disability. In his report of October 13, 1967, he stated:

''The factors of causation in psychiatric disability are rarely as clear-cut as in some other branches of medicine. However, in my judgment, it is most unlikely that this disorder would have occurred in this individual, unless there had been fairly severe stress at work. He had successfully gotten through 20 years of military service, dealing with men under very trying conditions as a non-commissionied [sic] officer, without any psychiatric disability.''

In his report of February 3, 1968, Dr. Wallace stated: ''It appears to me that Mr. Skinner was able to work until the unusual stress at work, and that he became disabled only after that stress was imposed for a prolonged period of time. It is reasonable to suppose that the work stress caused the disability, which would then have to be considered 100% 'caused' by the work injury. As I understand it, it is irrelevant as to whether he might have been disabled later on following other possible stresses, in considering compensation at this time.''

In respect to further medical treatment, Dr. Wallace's report of October 13, 1967, expressed the opinion that applicant ''may have to return for further treatment in the future.'' Dr. Brody's report stated: ''My feeling is that Mr. Skinner would theoretically require additional psychiatric treatment which would include supportive psychotherapy and substantial doses of tranquilizers and anti-depressants.'' The February 3, 1968, report of Dr. Wallace comments that Dr. Brody's report reveals that applicant ''has relapsed completely, since he discontinued treatment. . . .''

Does the medical evidence compel a finding that there is no basis for apportionment? We hold that it does.

Labor Code section 4750 and Labor Code section 4663 provide that an employer is not liable for that portion of permanent disability caused by the *normal* progress of a preexisting disease or for any physical impairment or rateable permanent disability which preexisted the injury but he is fully liable for the disability resulting from the aggravation or ''lighting up'' of a nondisabling disease preexisting the industrial injury. The ''appeals board may apportion the

disability under section 4663 only in those cases in which part of the disability would have resulted, in the absence of the industrial injury, from the 'normal progress' of the pre-existing disease.'' (*Zemke* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 796 [69 Cal.Rptr. 88, 441 P.2d 928].)

Dr. Brody's opinion that ''a realistic figure would be 25% industrially related illness and 75% non-industrially related illness'' poses a bare legal conclusion. (*Granado* v. *Workmen's Comp. App. Bd.* (1968) 69 Cal.2d 399, 407 [71 Cal.Rptr. 678, 445 P.2d 294]; *Zemke* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 798 [69 Cal.Rptr. 88, 441 P.2d 928]; *Berry* v. *Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 786, 791 [69 Cal.Rptr. 68, 441 P.2d 908].)

In *Berry* the court stated (at p. 791) in respect to a similar opinion by a medical expert: ''It is evident from the foregoing excerpts that Dr. Parker suggested it 'would seem fair' to apportion one-half of Berry's disability to the prior disease because the doctor was under the misapprehension that if an employee has a preexisting disease and thereafter suffers an industrial injury, the resulting disability should be apportioned between the two, even though the industrial injury caused the previously dormant disease to 'light up.' As discussed in *Reynolds Electrical, supra* [*Reynolds Electrical etc. Co.* v. *Workmen's Comp. App. Bd.* (1966) 65 Cal.2d 438 (55 Cal.Rptr. 254, 421 P.2d 102)], the law is to the contrary. Viewed in the light of the prevailing rules, the Parker reports cannot reasonably justify apportionment. Indeed, they compel the conclusion that Berry's entire disability resulted from the condition of his knee, that the disease, which was asymptomatic before the injury, was 'lighted up' by the trauma, and that therefore no apportionment was proper. Under these circumstances, the fact that the doctor stated it was his 'offhand feeling' that it would be 'fair' to apportion 50 percent of the disability to the prior disease is irrelevant to the board's determination.''

In *Zemke,* the court stated (at pp. 798-799) : ''The question whether the disability is partially due to the normal progress of the disease presents an issue of fact which the board must resolve on the basis of expert medical opinion. Dr. Nippell's report, however, nowhere discloses either facts or opinion on the relationship between applicant's disability and what would have been the normal progress of his preexisting condition in the absence of his industrial injury. Instead, the report states an opinion on a legal matter: the proper appor-

tionment in this case. Such an opinion, especially when it fails to disclose its underlying basis, does not constitute competent evidence upon which the board may rely in ordering apportionment.''

In the present case the report of Dr. Brody does not state an opinion based on medical probability that there was pre-existing rateable disability. It does not state that the preexisting ''condition'' would have progressed. It states neither facts nor opinion on the relationship between applicant's disability and what would have been the *normal* progress, if any, of the preexisting ''latent'' condition or disease which he tentatively suggested only. In light of the doctor's statements to the effect that the latent condition was aggravated and compounded by work stress and probably would have remained undetected without the work stress, we can only conclude that the doctor's report compels denial of apportionment. It is evident that he was under the misapprehension that disability is apportionable simply because the applicant has a predisposition to disease or that it is apportionable even though an industrial injury causes a previously dormant disease to ''light up.''

The decision of the Workmen's Compensation Appeals Board is annulled and the cause is remanded to the board for further proceedings consistent with the views herein expressed.

Files, P. J., and Kingsley, J., concurred.