[Civ. No. 48736. Second Dist., Div. Five. Apr. 8, 1977.]

MARY ANN BSTANDIG, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and
STATE COMPENSATION INSURANCE FUND, Respondents.

**COUNSEL**

Minsky, Garber & Rudof and Joel Rudof for Petitioner.

Thomas J. McBirnie, T. Groezinger, James J. Vonk, George S. Bjornsen and Frank Evans for Respondents.

**OPINION**

**KAUS, P. J.**—Proceeding to annul an award of workers' compensation limiting temporary disability benefits and apportioning permanent disability. Award annulled.

Petitioner, the applicant in the underlying compensation proceeding, was retrospectively awarded 18½ months of temporary disability benefits and a permanent disability rating of 25 percent after apportionment. She contends the finding that her disability had reached a "permanent and stationary" status was premature and that apportionment of her permanent disability to nonindustrial factors was not justified by the evi- ██ We conclude that there is merit in petitioner's first contention; i.e., the finding that her status had become permanent and stationary was at odds with the medical opinions and the justification for disposition contrary to those opinions was inadequate. As to apportionment of the not-then-permanent disability, that determination must abide the event of ultimate evaluation, and the most we can make is a general comment on the parties' contentions in that regard.

The chronology and procedural history of the case have a bearing on the issue of permanency of the disability.

In an application filed July 7, 1973, petitioner, then 55, alleged a psychic injury in the employment of Occidental Life Insurance Company as an actuarial clerk during the period October 11, 1967 to September 5, 1972.

At an initial hearing held August 13, 1974, the issue was limited to that of industrial injury or none. It was made apparent that petitioner had suffered a psychological crisis in August 1972, and had not been employed since September 5, 1972. The employer had deemed the condition to be non-industrial and had provided certain compensation under a group disability plan. In the months following her cessation of work, her personal physician had diagnosed "nervous fatigue," but as to any psychological distress had merely commented that "he had never seen a case like this before in his life and had no treatment to offer." A physician had reported to the compensation insurer that, from a physical standpoint, "there is no reason that this patient cannot work," but he had noted the "schizophrenia, of the paranoid type" also observed by the evaluating doctors to whom petitioner had been referred by her counsel.

Remarkably, by the time of the first hearing in August 1974, petitioner's treatment (as opposed to evaluation) had consisted of chiropractic attention for being "extremely nervous" with "muscle spasms," plus the care of a Chinese herbalist, for similar complaints, from whom she received "pills and herbs." This, despite the reports of the evaluating psychiatrists who reported, typically, that "her paranoid schizophrenia is quite apparent, and she is clearly psychotic at this time, suffering under delusions." It appeared that she had also become a "transient" "moving around because of her suspicions."

Disposition at the August 1974, hearing was that she be examined by Dr. John M. Suarez, an agreed examiner in psychiatry, all matters to remain off calendar in the interim.

Dr. Suarez submitted his report November 12, 1974, and both sides requested an opportunity to cross-examine him. That examination occurred April 29, 1975, after which the case was submitted on all issues. However, the April hearing was primarily concerned with the work-relatedness of petitioner's condition and "apportionment" of the disabili-

ty. No emphasis was given to the currency of her then-present psychological state or need for psychiatric treatment.

A proposed permanent disability rating issued December 4, 1975, "for disturbed mental-emotional state resulting in total disability, 25% of which only results from the present employment."

The award of March 11, 1976, conferred "temporary total disability beginning September 6, 1972 through March 21, 1974," "medical treatment . . . required to cure or relieve from the effects of this injury," and permanent disability payments, amounting to 95½ weeks, going back to March 1974.

As to the implicit finding that petitioner became "permanent and stationary" on March 21, 1974, the compensation judge explained in his opinion that he selected that date as "the first time applicant was examined by a physician, Dr. Louis L. Lunsky, qualified to render an opinion on her condition."

Dr. Lunsky had reported for petitioner and diagnosed "schizophrenia, paranoid type," but in form at least his report was addressed to an "episode":

"It is quite apparent that this patient had an acute schizophrenic episode occurring in August 1972. Three or four months prior to this she began to develop symptoms of depersonalization, derealization, and inability to handle reality events. She tends to blame this whole process and both overt and covert criticisms by her supervisor. What upset her was the fact that she was trying so hard yet she wasn't making it.

"She should be considered temporarily totally disabled and is in need of intensive hospital psychiatric care. She probably will need electro-shock treatments.

"She will never really go to any doctor that she's directed to by the insurance company so I do feel it would be wise to let her select her own doctor for such treatments. The herbs she is getting are absolutely worthless and she is in need of pharmacotherapy and other adjunctive psychiatric treatments.

"I do feel her work situation aggravated and possibly precipitated her current psychiatric crisis.

"She should be reevaluated again in nine months' time."

As to that opinion, but speaking two years later, the judge concluded: "Although Dr. Lunsky states that applicant is temporarily totally disabled, he states nothing in support of his conclusion that the condition that applicant is suffering from is temporary or that there is a reasonable expectation of reducing the disability. The nature of the condition and the medical evidence is contrary. . . . Therefore although Dr. Lunsky recommended treatment, there is no evidence that it was with a view to reduce applicant's total disability, rather than merely relieve her of some of her symptoms."

Two other psychiatric evaluations were pertinent. Dr. Desmond G. Boyle had reported for the insurer as of August 5, 1974. He diagnosed "schizophrenic reaction, paranoid type" and, although he noted that all of the "delusions" and "psychotic ideation" he detected were aimed at petitioner's immediate past employment, it was his "tentative conclusion that this unfortunate lady's psychotic condition has no relationship to her working conditions, and is likely part of a life-long reaction and style." As his "recommendation," he stated: "Ms. Bstandig is clearly in need of psychiatric care. I do believe that psychiatric hospitalization and electroshock therapy might offer her some relief from her problem."

The judge took Dr. Boyle's opinion to mean: ". . . although he felt that hospitalization and electroshock therapy might offer some relief from the problems, he expressed the opinion that the nature of this type of condition is such that little can be done for it."

In his report of November 12, 1974, Dr. Suarez, the agreed examiner, had also spoken of the then-current state of affairs. He first noted "a psychosis more characteristic of true paranoia than schizophrenia" and gave his "impression that this condition developed slowly beginning in the late 1960s, and became full blown and incapacitating by the middle of 1972. It is difficult to accept that she had no paranoid symptomatology prior to that."

He continued: "There is no disagreement about the diagnosis of her current condition. The dilemma pertains to the causes of her psychiatric decompensation. It is most likely that her conflicts at work resulted from

her progressive malfunction and inadequate interpersonal relationships, rather than a plot to make her life miserable and force her to quit. I would attribute the major stress to the death of her mother and brother [in 1968], which she now minimizes. I would thus apportion 75% as a reaction to those deaths, and only 25% to her industrial situation."

However, his "apportionment" of "her current condition" was followed by more specific comment as to the condition's being "permanent and stationary": "She is totally disabled currently on psychiatric grounds. I would recommend psychiatric therapy prior to concluding that she is permanent and stationary, although her prognosis is, by now, quite poor. I believe that she can be treated on an outpatient basis with medication, . . . ."

In his report on reconsideration dated April 7, 1976, the judge explained away the November 1974 impressions of Dr. Suarez as follows: "Although Dr. Suarez was reluctant to declare applicant's condition permanent and stationary when he first examined her, from a medical standpoint, legally her condition was permanent and stationary because there was no reasonable expectation that as a result of any drastic treatment applicant would be in any way employable in the future. Continued need for hospitalization is not inconsistent with applicant's otherwise permanent condition."

The appeals board's order denying reconsideration, dated April 29, 1976, and approving the finding of "permanent and stationary" as of March 21, 1974, merely stated: ". . . We believe that the further medical treatment previously awarded will provide some relief from the effects of this injury but that she has become permanent and stationary to the extent that she will probably not improve according to the supporting medical opinions."

One member of the panel dissented and explained: ". . . A careful review of the medical evidence convinces me that the applicant has not yet become permanent and stationary. At least three separate psychiatrists examined the applicant; one reported for the defendant, one for the applicant, and one was an independent medical examiner. All of those doctors indicated that the applicant requires further psychiatric treatment and is not permanent and stationary. . . . Therefore, I would prefer to grant reconsideration and award the applicant continuing temporary disability, as well as further medical treatment. For the above reasons, I am reluctant to stigmatize this applicant with the characterization of

being 100% psychiatrically disabled, until there has been some attempt at treatment, as recommended by each of the three psychiatrists, nor am I willing to impose a 100% permanent disability award upon the defendants until every reasonable effort is made to reduce applicant's permanent disability."

Petitioner's claim to total temporary disability benefits (Lab. Code, §§ 4650-4656) and preevaluation medical treatment (Lab. Code, § 4600) beyond March 21, 1974, is well-founded. Most simply, there are two vices in the result as it now stands:

(1) The Board has itself resolved a question, inconsistently with the medical opinion on the point, "where the truth is occult and can be found only by resorting to the sciences." (*State Comp. Ins. Fund* v. *Indus. Acc. Com.,* 195 Cal. 174, 184 [231 P. 996]; see also *LeVesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627, 639-640 [83 Cal.Rptr. 208, 463 P.2d 432].) The justification for doing so—a lay-determinable total permanent disability—is merely "an unnecessarily grim view of the case." (*Abril* v. *Workers' Comp. Appeals Bd.,* 55 Cal.App.3d 480, 487 [127 Cal.Rptr. 483].)

(2) As a matter of substance, petitioner has been deprived of her "cure" (Lab. Code, § 4600), her "healing period" (Cal. Workmen's Compensation Practice (Cont.Ed.Bar 1973) § 14.12; 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. 1976) § 13.02[2] and her "wage replacement" (*Russell* v. *Bankers Life Co.,* 46 Cal.App.3d 405, 415-416 [120 Cal.Rptr. 627]). Because of the peculiarities of the case and the course of procedure, the period from September 6, 1972, through March 21, 1974, and for some indefinite time thereafter was more nearly an interregnum than a meaningful period of temporary disability and treatment. In the nature of things, perhaps benefits could never have been provided at the times and in the sequence contemplated in the Labor Code, but a more current determination is necessary to implement petitioner's substantive entitlement to medical and temporary disability benefits.

Respondents invoke certain decisions illustrating that the concept of "permanent and stationary" is not always a purely medical one. In *Dahlbeck* v. *Industrial Acc. Com.,* 135 Cal.App.2d 394, 400 [287 P.2d 353], the court envisioned "a condition which is progressive and ultimately fatal" and held that the same might constitute "previous permanent disability" for purposes of apportionment and Subsequent

Injuries Fund benefits. (Lab. Code, §§ 4750, 4751.) It is difficult to argue with that. In *Sweeney* v. *Industrial Acc. Com.,* 107 Cal.App.2d 155, 159-160 [236 P.2d 651], the court approved a commission finding that an allergy that had manifested itself on four occasions did not reflect a "permanent" "sensitivity." The attitude toward allergies has changed (see *Nielsen* v. *Workmen's Comp. Appeals Bd.,* 36 Cal.App.3d 756 [111 Cal.Rptr. 796]), but in any event the *Sweeney* decision would argue more against, than for, the finding of permanency in the present case.

The board mentions *Hart* v. *Industrial Acc. Com.,* 119 Cal.App. 200 [6 P.2d 348], and *Industrial Indem. Exch.* v. *Ind. Acc. Com. (Riccardi)* 90 Cal.App.2d 99 [202 P.2d 850]. In *Hart* the finding was that a knee condition unchanged for two and one-half years was permanent and stationary notwithstanding the need for further or "lifetime" medical treatment. The picture as to disability seems to have been the possible one of "permanently" "unstationary." The point as to further medical care is well-accepted if the meaning was that "cure" was impossible or improbable, but indefinite "relief" was required. (Cf. Lab. Code, § 4600.) The *Riccardi* case was an odd one in which an unremovable foreign object was lodged in the worker's heart. He was totally disabled and had been so for 27 months. His medical condition was subject to slight change and conservative medical treatment, but his "progress" was "in the opposite direction." He was held permanent and stationary for rating purposes, the thought being that his "healing period" had expired and any fluctuation in his medical condition would not change the consideration that he was totally and permanently disabled.

Theoretically it may have been possible to force petitioner's case into the foregoing pattern of readily determinable total permanent disability. The difficulty is that the problem was not one of lay theory, but one of diagnosis, prognosis and treatment in an occult branch of medicine. (Cf. *County of L. A.* v. *Indus. Acc. Com. (Cordes)* 14 Cal.App.2d 134, 136-138 [57 P.2d 1341].) Though awkward as a matter of procedure and timing, the case should have been made to conform as closely as possible to the usual pattern of treatment and post-treatment evaluation preceding the determination of "permanent and stationary." (*W. M. Lyles Co.* v. *Workmen's Comp. App. Bd. (Butz)* 3 Cal.App.3d 132, 136 [82 Cal.Rptr. 891].)

As to the apportionment of 75 percent of petitioner's disability to nonindustrial factors, the finding is also premature. Thus any comment as to apportionment in this case is anticipatory, but several uncertainties

in the present record are notable. Dr. Lunsky had opined that "her work situation aggravated and possibly precipitated her current psychiatric crisis." That is a statement of industrial "injury" (Lab. Code, § 3208), but it is ambiguous as to apportionment. As explained in *Brown* v. *Workmen's Comp. Appeals Bd.,* 20 Cal.App.3d 903, 913-914 [98 Cal.Rptr. 96]: "Section 4750 [apportionment against "previous permanent disability"] must be construed in light of the rule that acceleration, aggravation, or 'lighting up' of a preexisting nondisabling condition is an injury in the employment causing it and if the resultant disability is entirely due to the industrial injury 'lighting up' the previous dormant condition, then the employer is liable for that disability and there can be no apportionment. Whether the disability results in whole or in part from the *normal progress* of a preexisting disease or represents a fully compensable lighting up or aggravation of a preexisting condition is a factual issue for the WCAB to determine . . . . [Italics in original.] Although the prior disability need not be reflected in the form of loss of earnings, if it is not, it must be of a kind upon which an award for partial permanent disability could be made had it been industry caused. This is necessary to distinguish it from a 'lighting up,' aggravation, or acceleration of a preexisting physical condition where the employer is to be held liable for the whole."

■ The rule under Labor Code section 4663 (apportionment against "prior disease" "aggravated" by industrial injury) is identical. (*Ballard* v. *Workmen's Comp. App. Bd.,* 3 Cal.3d 832, 837 [92 Cal.Rptr. 1, 478 P.2d 937].)

Petitioner's case seemed not to fit the pattern of "previous permanent disability." (See *Skinner* v. *Workmen's Comp. App. Bd.,* 269 Cal.App.2d 905 [75 Cal.Rptr. 314]. Compare *Subsequent Injuries Fund* v. *Ind. Acc. Com.,* 53 Cal.2d 392 [1 Cal.Rptr. 833, 348 P.2d 193].) However, in parts of his report and testimony Dr. Suarez followed a permissible pattern of apportionment by ascribing a part of her disability to the "normal progress" of her psychological propensities. (*Zemke* v. *Workmen's Comp. App. Bd.,* 68 Cal.2d 794, 796 [69 Cal.Rptr. 88, 441 P.2d 928]; *Tanenbaum* v. *Industrial Acc. Com.,* 4 Cal.2d 615, 617-618 [52 P.2d 215].) Nonetheless, the doctor came dangerously close to apportioning "causation," rather than "disability," in attributing petitioner's distress partly to "work stresses" and partly to "other stresses." ■ If "work stress" is *"a* contributing cause" of *"a* disability" or *"the* disability," apportionment is not in order. (*Lamb* v. *Workmen's Comp. Appeals Bd.,* 11 Cal.3d 274, 281 [113 Cal.Rptr. 162, 520 P.2d 978]; *Redmond* v. *Workmen's Comp.*

*Appeals Bd.,* 36 Cal.App.3d 302, 306 [111 Cal.Rptr. 530].) In other words, apportionment in terms of sources of stress is permissible only insofar as a discreet and discernible portion of the disability can be imputed to each source.

Also, the doctor seemed to say that petitioner's work difficulty was the "cause" or "trigger" of her distress, but that if it had not been the work, inevitably it would have been something else. That is an observation often seen in the psychological cases, as well as the heart cases. Taken literally it would preclude apportionment—the identified "cause" cannot be made to yield to purely hypothetical ones. (See, e.g., *Employers etc. Ins. Co. v. Ind. Acc. Com. (Gideon),* 41 Cal.2d 676, 680 [263 P.2d 4]; see also *Madin v. Industrial Acc. Com.,* 46 Cal.2d 90, 92-94 [292 P.2d 892].)

▇ As explained generally in the practice works, the technique of apportionment in even the most difficult cases is to describe, evaluate and rate disability with work and without—and subtract. (Cal. Workmen's Compensation Practice (Cont.Ed.Bar 1973) §§ 14.22-14.26; 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed. 1976) § 14.04.) If that proves impossible or imponderable, the case is not one for apportionment.

The award is annulled and the case is remanded to the board for further proceedings consistent with this opinion.

Ashby, J., and Hastings, J., concurred.