[Civ. No. 20949. Third Dist. May 18, 1982.]

TERRY DITLER, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD, SAN JUAN
UNIFIED SCHOOL DISTRICT et al., Respondents.

806

COUNSEL

Green. & Azevedo and Donald C. Green for Petitioner.

Richard A. Krimen, Michael J. Brodie, Arthur Hershenson, Fernando Da Silva and Louis Harris for Respondents.

## OPINION

**SPARKS, J.**—In this case we consider the principles of apportionment for a prior disability under the Workers' Compensation Act. Applicant Terry Ditler sustained cumulative psychiatric injury while employed from September 19, 1969, through September 27, 1977, as a teacher by the San Juan Unified School District. There is no dispute that the injury sustained was work-related or that the disability suffered is permanent. Ditler contends that the Workers' Compensation Appeals Board erred in apportioning 50 percent of his overall disability to preexisting nonindustrial causes. We agree.

I

### DISABILITY HISTORY

Ditler was hired by the San Juan Unified School District in September 1969 to teach "shop" class at Louis Pasteur Intermediate School in Orangevale, California.[1] He was 33 years old. In the spring of 1977 he was informed by school administrators he would be transferred to Will Rogers Intermediate School, his new assignment to begin in September 1977. On September 27, 1977, after teaching at Will Rogers School for three weeks, Ditler secured medical leave from the school because of nervous tension, anxiety and depression. On October 3, 1977, Ditler filed an application for adjudication of claim before the Workers' Compensation Appeals Board.

Because of a conflict in the medical testimony[2] submitted at the adjudication hearing held May 8, 1978, applicant was ordered to undergo

---

[1]Ditler's employment history, following his graduation from college in 1961 is as follows: In the fall of 1961 Ditler obtained a position teaching drivers training in Lodi, California school system. In 1963, he took a position in Lompoc, California teaching auto shop. He left voluntarily after one year, discouraged because of discipline problems he had encountered. He then worked as a claims adjuster for an insurance company in San Francisco for approximately two years. From 1966 to 1969, Ditler taught high school drivers training and mathematics in Woodland, California. Because of a personality conflict with the principal and Ditler's alleged incompetence, he was forced to resign from this position in 1969.

[2]Ditler was examined by a Dr. Goldfield on March 28, 1978. It was Dr. Goldfield's opinion that Ditler's emotional breakdown was a "direct result of the school situation." A report submitted by Dr. Estep, dated February 3, 1978, did not discuss the cause of Ditler's disability, but simply indicated that he was unable "to continue teaching for an indefinite period of time."

Dr. Lyons submitted a report, dated January 26, 1978, in which he opined that Ditler "is the sort of man who would have, unfortunately, had difficulties on the job no

an examination by Dr. Groesbeck, an independent medical examiner. In his initial report, dated October 4, 1979, Dr. Groesbeck concluded that all of Ditler's present disability should be attributed to industrial causes arising out of his employment by San Juan School District. The doctor stated, "There are other factors of a non-industrial nature in this individual's life, but they would not appear to be contributing to his present problem. But for the loss of his old job and having to face the new and difficult job that he had in the fall of 1977, this individual would not have become ill in the way that he did. Hence, there would be no grounds for apportionment. One might argue, of course, that eventually this individual would have had difficulty. That is most likely true, but when and where and how that would have happened would be very hard to determine. That is, but for the stress of losing his old job, it could at least generally be said he most likely would still be working today as he had done before."

On April 2, 1980, Dr. Groesbeck filed a supplemental report in which he revised his opinion regarding apportionment. He stated, ". . . it is felt that the difficulty his wife was having with depression clearly played a part in contributing to this individual's difficulties. In addition, it must be stated that this individual's pre-existing passive-dependent personality pattern and borderline functioning that he had had throughout the earlier years in his work in teaching specifically do suggest evidence for pre-existing disability that predated the main disability for which he became disabled. It is felt that this pre-existing disability pattern of functioning along with the contributions made by his wife would amount to 50% non-industrial apportionment disability whereas the other 50% would be related to the individual elements activating his illness."

At a hearing before Workers' Compensation Judge Burt Lancaster on June 6, 1980, Dr. Groesbeck was cross-examined regarding his supplemental report. The doctor opined that Ditler's disability would not have occurred had the environment at Will Rogers been similar to that

matter what his employment might have been . . . . Since I think that Mr. Ditler's problems stem entirely from his personality type, I do not see any need to make any apportionment here."

Dr. Petraki, in a report dated April 6, 1978, stated that "at the present time Mr. Ditler is suffering from a primary or biological form of depression which is caused by changes in brain chemistry which ante-dated his return to school in September of 1977 and which prevented him—not caused him—but prevented him from handling his new responsibilities. Thus . . . there is no indication of any industrial component to this case."

at Louis Pasteur. He stated, "[T]he anticipatory feeling of losing [the job at Pasteur] was very significant.... In this case, I think that this new job for him was a worse job. It did not have—did not meet the conditions he wanted and had in the previous job at Pasteur.... [t]he problems at Will Rogers were there and did make it difficult for him to cope. But this has to be dove-tailed into his condition that he was in before he came there, the loss of the other job and ideal situation that he had...."

When asked if there was any contribution to the disability from the teaching position at Pasteur, Dr. Groesbeck answered, "No, I think that those parts of the job were very meaningful and rewarding and were helping, if anything. Those functions could [be] said to have help[ed] maintain a level adjustment that he had prior to the difficulties that began."

Dr. Groesbeck explained that he changed his opinion regarding apportionment because "there was clear evidence in this man's history that he has had difficulties in his job situation through the years. I think there is clear evidence that he had passive, and has passive dependent personality patterns that have made it difficult for him to function all along. It is true he has been successful in his job, but I think one has to look at more than just that as the appraisal level of functional ability. And there was the depression which contributed to his coping ability."

The doctor testified that "... eventually this individual would have had difficulty.... With Mr. Ditler, I think that one might predict that eventually, especially as he got nearer to later age, retirement age, some difficulties could begin to affect his job, and certainly the job then played a part, a clear-cut part in the precipitation of his present difficulties that led to his becoming disabled. But, I think the re-appraisal would be more directed to the fact that there were difficulties in his adaptability and coping ability level all along with what he was having .... It's very likely that—suppose he had stayed in his job that he liked very much, the Louis Pasteur School, he may have gone on many more years functioning at that level as he was until such time—until that time there would have been changes such as old age, his own declining abilities .... But, because of the intervention of job problems this was up—the pattern was upset...."

Dr. Groesbeck opined that Ditler was carrying a partial permanent disability. He stated that although there was no manifestation of that

disability while Ditler taught at the Pasteur school "there was evidence [of such disability] in his previous jobs, yes, some of these difficulties." Dr. Groesbeck described the nature of the preexisting disability: "Of course, the job that he had, which was good, was one thing helping him, but then we have on top of that the threats of the loss of his job, the actual loss of [his] job .... And, again, we have to look before that to his wife's depression and how this influenced him. And then along with that we have to look at this personality problem that has been hanging over him for many years, that was also a factor that was making his equilibrium unstable. But ... he was coping, he was working, but these two liability factors ... his personality problem, plus the wife's problem, still did not make it to [a] level where he couldn't function. In fact, his job was a positive influence which kept up his self-esteem and kept him going, but when that toppled, you see, he had a full-blown reaction. ... these kinds of stresses, his wife's depression, the financial difficulties, difficulties they had with their son and his need of a [kidney] transplant, all of these things would put pressures on—affect his self-esteem and his identity and ability to produce and support his family."

The workers' compensation judge, relying on Dr. Groesbeck's opinion, apportioned 50 percent of Ditler's psychiatric disability as nonindustrial. On granting reconsideration, the appeals board affirmed the order of apportionment, finding that the medical testimony "clearly establishes a basis for legal apportionment as contrasted with mere apportionment of pathology."[3]

## II

### APPORTIONMENT

■ Permanent disability may be apportioned pursuant to either Labor Code section 4663 or section 4750.

---

[3]Because an incorrect age (33) was used by the workers' compensation judge in originally calculating the permanent disability rating of 25-1/2 percent, the board on reconsideration (following the workers' compensation judge's recommendation) modified the overall disability rating to 27 percent to reflect applicant's correct age at time of injury (41).

The board noted that the employer, San Juan School District, was legally uninsured after July 1, 1977, and that prior thereto State Compensation Insurance Fund had afforded insurance coverage. The board declined to address the fund's contention that there was insufficient evidence to sustain a finding that employment prior to September 1976 contributed to Ditler's disability; the court stated that this issue should be determined in later contribution proceedings.

Labor Code section 4663 states: "In case of aggravation of any disease existing prior to a compensable injury, compensation shall be allowed only for the proportion of the disability due to the aggravation of such prior disease which is reasonably attributable to the injury."

Labor Code section 4750 provides: "An employee who is suffering from a previous permanent disability or physical impairment and sustains permanent injury thereafter shall not receive from the employer compensation for the later injury in excess of the compensation allowed for such injury when considered by itself and not in conjunction with or in relation to the previous disability or impairment. [¶] The employer' shall not be liable for compensation to such an employee for the combined disability, but only for that portion due to the later injury as though no prior disability or impairment had existed."

"Under both Labor Code section 4663 and section 4750 the employer is liable to the extent the industrial injury accelerates, aggravates or 'lights up' the preexisting disability, condition or impairment. (*Callahan v. Workers' Comp. Appeals Bd.* (1978) 85 Cal.App.3d 621, 629 [149 Cal.Rptr. 647]; *Franklin v. Workers' Comp. Appeals Bd.* (1978) 79 Cal.App.3d 224, 237, 242-245 [145 Cal.Rptr. 22]; *Dorman v. Workers' Comp. Appeals Bd.* (1978) 78 Cal.App.3d 1009, 1018 [144 Cal.Rptr. 573]; *Bstandig v. Workers' Comp. Appeals Bd.* (1977) 68 Cal.App.3d 988, 997 [137 Cal.Rptr. 713].)" (*Gay v. Workers' Comp. Appeals Bd.* (1979) 96 Cal.App.3d 555, 561-562 [158 Cal.Rptr. 137].) "Both sections seek to avoid the employer from being charged with permanent disability unrelated to the industrial injury. [Citation.]" (*Callahan v. Workers' Comp. Appeals Bd.,supra*, 85 Cal.App.3d at p. 629.) Further, "[i]t is disability resulting from, rather than a cause of, a disease which is the proper subject of apportionment; 'pathology' may not be apportioned. [Citations.]" (*Pullman Kellogg v. Workers' Comp. Appeals Bd.* (1980) 26 Cal.3d 450, 454 [161 Cal.Rptr. 783, 605 P.2d 422].)

Section 4663 pertains to the situation where there is a prior disease which is activated or aggravated by an industrial injury. (*Tanenbaum v. Industrial Acc. Com.* (1935) 4 Cal.2d 615, 617 [52 P.2d 215].) To apportion under this section "it must be shown that the apportioned percentage of nonindustrial permanent disability would have resulted at present even in absence of the industrial injury. [Citations.] ... The issue is what in fact is the cause of the *present disability* rather than what are the hypothetical causes of a disability that might occur at some indefinite time in the future. [Citations.]

Thus, to support apportionment of nonindustrial disability under Labor Code section 4663, there must be medical evidence expressly stating that the apportioned disability is the result of the natural progression of the preexisting, nonindustrial condition and such nonindustrial disability would have occurred even in absence of the industrial injury. [Citations.]" (*Gay, supra,* 96 Cal.App.3d at p. 562.)

The board in this case apportioned Ditler's disability on the basis of Dr. Groesbeck's opinion that prior to the industrial injury he had a preexisting psychiatric disability. ██ ██ ██ ██ Neither the board nor Dr. Groesbeck purported to apportion based upon the natural progression of a preexisting condition.[4] Therefore, we deal only with apportionment pursuant to section 4750 and not under section 4663.

Section 4750 pertains to the situation where there is an actual preexisting disability or impairment from either industrial or nonindustrial causes. ██ "The purpose of this statutory provision is to encourage the employment of physically disabled persons by assuring an employer that he will not be liable for the total combined disability present after an industrial injury, but only for that portion which is attributable to the subsequent industrial injury." (*State Compensation Ins. Fund* v. *Industrial Acc. Com.* (*Hutchinson*) (1963) 59 Cal.2d 45, 49 [27 Cal.Rptr. 702, 377 P.2d 902].)

██ "[I]n order for the Board to rely upon a physician's evaluation as to apportionment under section 4750, 'the physician must disclose adequate familiarity with the preexisting disability.' [Citation.] That is, the physician must describe in detail the exact nature of the preexisting disability and the basis for such an opinion in order that the Board be able to determine whether the physician is properly apportioning under correct legal principles." (*Callahan, supra,* 85 Cal.App.3d at p. 630; see

---

[4]Nowhere in his reports or testimony does Dr. Groesbeck "expressly stat[e]" that Ditler sustained one-half of the present disability as a natural progression of a preexisting condition. (*Gay, supra,* 96 Cal.App.3d at p. 562; cf. *Tanenbaum* v. *Industrial Acc. Com., supra,* 4 Cal.2d 615.) The doctor expressly refuted the notion that Ditler's condition was getting progressively worse; he stated that until the stress-causing transfer his teaching position at Pasteur school "was helping, if anything." The only medical evidence that arguably fits within a section 4663 analysis is the doctor's suggestion that Ditler would ultimately have suffered psychiatric disability even without this work stress (see *Gay, supra,* 96 Cal.App.3d at p. 562). However, this testimony is too speculative and conclusory to constitute substantial evidence that Ditler's present disability is due in part to the normal progress of preexisting disease. (See *Duthie* v. *Workers' Comp. Appeals Bd.* (1978) 86 Cal.App.3d 721, 731 [150 Cal.Rptr. 530].)

also *Gay* v. *Workers' Comp. Appeals Bd., supra,* 96 Cal.App.3d at p. 562; *Calhoun* v. *Workers' Comp. Appeals Bd.* (1981) 127 Cal.App.3d 1, 10 [179 Cal.Rptr. 198].) However, "neither the fact that the preexisting disability did not interfere with the occupation the injured was engaged in at the time of the subsequent injury nor the fact that it was unknown to him is determinative. The question is whether it can be demonstrated . . . that the preexisting condition did interfere or would have actually interfered with any type of work activity." (*Franklin* v. *Workers' Comp. Appeals Bd.* (1978) 79 Cal.App.3d 224, 241 [145 Cal.Rptr. 22].) In other words, to constitute a permanent partial disability, the preexisting condition must have been "'labor disabling.'" (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1972) 24 Cal.App.3d 650, 658 [100 Cal.Rptr. 540].)

■ We conclude that, judged by these standards, Dr. Groesbeck's report and testimony are inadequate to support the finding on apportionment.

The clear thrust of Dr. Groesbeck's opinion is that Ditler's work difficulty in the spring and fall of 1977 was the "cause" or "trigger" of his psychiatric disability. The doctor testified that if the environment at the new school had been similar to that of the old, Ditler's disability would not have occurred when it did. Yet the doctor nevertheless found apportionment appropriate because of the existence of a preexisting disability consisting of Ditler's passive-dependent personality and several life stresses (wife's depression, financial problems, son's kidney problem). By grounding apportionment on the multiple causes of Ditler's psychiatric injury, even though the present disability would not have occurred in absence of the work-related injury, the doctor improperly apportioned to pathology rather than focusing on the present disability for which compensation was sought. (See *Duthie, supra,* 86 Cal.App.3d at p. 731; *Dorman, supra,* 78 Cal.App.3d at p. 1018.) As the court stated in *Bstandig* v. *Workers' Comp. Appeals Bd., supra,* 68 Cal.App.3d at page 998, ". . . The identified 'cause' cannot be made to yield to purely hypothetical ones. [Citations.]" Because Dr. Groesbeck's opinion was based on an erroneous legal theory, it cannot serve as substantial evidence on which to base an apportionment finding.[5]

---

[5]Ditler argues that since he was found to have sustained cumulative injury from 1969 to 1977, the doctor could not rely on Mrs. Ditler's depression in 1974 as evidence of a *preexisting* disability. However, there is an issue in this case, which the Board deferred to later proceedings and which is not presently before this court, as to when the injury actually occurred. (See fn. 3, *ante.*) We therefore do not offer an opinion on whether the doctor's conclusions suffered from this alleged temporal infirmity.

Further, the fact that Ditler may have suffered psychiatric injury in the future (as Dr. Groesbeck stated) is "irrelevant to the extent that the present disability is, in fact, due to the industrial injury." (*Franklin, supra,* 79 Cal.App.3d at p. 243.)

The apportionment award is also improper because there is insufficient evidence to show that the preexisting disability was "labor disabling." The record discloses that Ditler had lost little, if any, time from work since his graduation from college in 1961.[6] While Dr. Groesbeck testified that there was "evidence [of disability] in his previous jobs," he fails to describe in detail what that evidence is.[7] The doctor also fails to explain how the "preexisting disability," which he rated as being "slight to very slight" prior to the injury, translates into 50 percent apportionment. (See *Callahan, supra,* 85 Cal.App.3d at p. 630.) Dr. Groesbeck's apportionment is a "mere legal conclusion" (*Zemke v. Workmen's Comp. App. Bd.* (1968) 68 Cal.2d 794, 798 [69 Cal.Rptr. 88, 441 P.2d 928]) and, consequently, cannot support a finding of apportionment.

It is now well settled that a prophylactic work restriction may not be applied retrospectively to create "a sort of factual or legal fiction of an otherwise nonexistent previous disability . . . ." (*Gross v. Workmen's Comp. Appeals Bd.* (1975) 44 Cal.App.3d 397, 404 [118 Cal.Rptr. 609].) Rejection of that doctrine was premised on the notion that it is speculative to say that a disability existed prior to industrial injury in absence of any hard evidence of such a disability. Moreover, as Ditler points out, there is a great danger that the discredited prophylactic restriction doctrine may be resurrected in the guise of the "congenial work setting" doctrine, which permits an employer to demonstrate by medical evidence that the preexisting condition, "though it did not interfere with that work, was nevertheless disabling within the meaning of

---

[6]We are aware, of course, that a preexisting disability need not be reflected in the form of a net loss of earnings; however, "if it is not, it should at least be of a kind which could ground an award of permanent partial disability." (*Ferguson v. Industrial Acc. Com.* (1958) 50 Cal.2d 469, 477 [326 P.2d 145]; see also *Smith v. Industrial Acc. Com.* (1955) 44 Cal.2d 364, 367 [282 P.2d 64]; *Subsequent Injuries Fund v. Industrial Acc. Com. (Allen)* (1961) 56 Cal.2d 842, 845 [17 Cal.Rptr. 144, 366 P.2d 496].) The facts here would not support such an award.

[7]The record reveals that Ditler worked for five different employers from 1961 through 1978; he left one job because of discipline problems with students and was forced to resign from another because of a personality conflict and alleged incompetence. These facts do not constitute substantial evidence that Ditler suffered from a "labor disabling" preexisting disability.

the statute." (*Robinson* v. *Workers' Comp. Appeals Bd.* (1981) 114 Cal.App.3d 593, 603 [171 Cal.Rptr. 48].) Under this doctrine, apportionment would be theoretically possible in psychiatric disability cases based on a retrospective medical opinion that a condition is "labor disabling" even though asymptomatic and nondisabling in the employee's particular work.[8] (See *Franklin, supra*, 79 Cal.App.3d at pp. 238-241; *Moyer, supra*, 24 Cal.App.3d at p. 658; see also *Subsequent Injuries Fund.* v. *Industrial Acc. Com., supra*, 56 Cal.2d at p. 845.) Because many of the same dangers that brought about the demise of the prophylactic work restriction doctrine exist under the congenial work setting doctrine, "[t]his form of apportionment should be scrutinized very carefully by the workers' compensation judges, the Appeals Board, and the courts to ensure that evidence supporting this type of apportionment is substantial." (*Apportionment in Permanent Disability Cases, supra*, 15 Cal. Western L.Rev. at p. 425.)

III

DISPOSITION

The award is annulled as it pertains to apportionment, and the matter remanded to the board for the obtaining of further evidence or such other proceedings consistent with this opinion.

Regan, Acting P. J., and Evans, J., concurred.

---

[8]Evidence of a preexisting disability may come from a variety of sources; for example, a previous finding of disability in a Workers' Compensation Appeals Board proceeding, testimony by the worker concerning actual disability before the injury, complaints to coworkers or physicians before the injury, treatment to the same part of the body before the injury, measurable preexisting loss of functioning, or other similar evidence demonstrating actual preexisting disability. (See Williams, *Computation of Apportionment in Permanent Disability Cases Under California Workers' Compensation Law* (1980) 15 Cal. Western L.Rev. 395.)