Filed 4/10/14  Webster v. Miles CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KIMBERLY WEBSTER, | F065629 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 10CECG03742) |
| PEGGY LOREN MILES, | **OPINION** |
| Defendant and Respondent. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alan M. Simpson, Judge.

Law Offices of Robert G. Gilmore, Robert G. Gilmore; Tritt & Tritt and James F. Tritt for Plaintiff and Appellant.

Stammer, McKnight, Barnum & Bailey and Abigail R. Leaf for Defendant and Respondent.

-ooOoo-

Kimberly Webster sued Peggy Loren Miles for personal injuries arising from a rear-end collision.  Webster appeals from the judgment entered on a jury verdict and an order denying her new trial motion.  The jury awarded Webster $9,395 in past economic damages for medical expenses, property damage, and a rental car, and $250 in past non-

economic loss.  Webster contends the damage award is inadequate as a matter of law as the jury necessarily found she was injured, yet awarded only a portion of her medical expenses and a nominal amount for pain and suffering.  We find that because there was conflicting evidence regarding the nature and extent of Webster's accident-related injuries, the jury reasonably could conclude Webster was entitled to recover medical costs for short-term treatment of soft tissue injuries and award only a minimal amount for non-economic damages.  Accordingly, the trial court did not err in denying the motion for new trial and we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

We view the evidence in the light most favorable to the judgment.  (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 61 (*Bertero*).)

On the morning of March 2, 2010, Miles, who was driving a Lincoln Continental, rear-ended Webster's Chevrolet Malibu, which was stopped for a red light at an intersection.  The impact pushed Webster's car into a Chevrolet Silverado truck stopped in front of her.  Miles, who admitted liability, asked Webster, who was sitting in her car, if she was all right.  Webster told her she felt shaken, but did not say she was hurt.  While still at the scene, Webster called her girlfriend to ask her to pick up Webster's son; she also called her husband.  There was no visible damage to Miles's car; her air bags did not deploy and she was able to drive the car away from the scene.  The damage to the truck was minimal.  The repairs to Webster's car cost $3,644.75.

An ambulance and police were called to the scene.  According to the traffic collision report, Webster told police she felt "an abrupt 'bump[,]'" and complained of pain to her head and neck.  The ambulance transported Webster to an emergency room, where she was given a shot for pain.  After the doctors ran some tests, she was sent home. Webster did not have any cuts or bruises after the accident.

The next day, Webster saw her primary care physician, Dr. Gary M. Critser.  She went to see him because she "was feeling 100 times worse" than the day before; her

2.

headache was worse and she felt lost and fuzzy. The medical records for that visit listed Webster's "[c]hief complaint" as pain in the left elbow, neck and both shoulders. Dr. Critser did not document any headaches, memory or concentration issues, or perform a mini mental examination, which typically is done when a patient complains of memory loss or confusion. At a follow-up visit on March 8, 2010, Webster complained of having a "constant headache," that she did not "remember anything during the day," and she felt something was wrong with her head. A nurse practitioner gave Webster a mini mental examination; she scored 28 out of 30, which is normal. Webster had a CT scan of her brain on March 11, 2010, which was unremarkable.

Webster claimed that in the first few weeks after the accident she "was confused a lot" and did not remember to feed her children dinner, how to make mashed potatoes, or how to load the dishwasher. She reported stuttering and stammering. She was having difficulty comprehending reading materials and retaining the information contained therein. During the first six months after the accident, Webster complained to Dr. Critser that she had tremendous headaches or pain in her upper back; since the pain was not responding to the medication she was on, he gave her more potent medication. Webster described her pain during the first three to four months after the accident as about a nine to a ten on a scale of one to ten, with ten being the worst pain. Over the course of his treatment of Webster, which was ongoing as of the trial date, Dr. Critser prescribed pain medications, gave her injections to help with inflammation and pain, and sent her to physical therapy.

Webster first received physical therapy at Jimenez Physical Therapy, but she said the therapy was traumatically painful and intense. Due to the pain, as well as possible insurance issues, Dr. Critser sent her to Functional Integrated Therapy for physical therapy. Nearly a year after the accident he referred her for physical therapy at Creative Therapeutics as they used a different kind of physical therapy that he thought might benefit Webster. Two to three months before the trial, Dr. Critser referred Webster to an

3.

orthopedist at Sierra Pacific Orthopedic Center because the pain in her mid-back was not improving. She was examined there three times and, during one visit, she was given an injection in her shoulder.

Dr. Critser acknowledged Webster's patient chart did not consistently document memory or concentration problems after the accident. At a July 19, 2010 follow-up examination, Webster reported her pain was slowly reducing. She had not been given any further mini mental examinations. Notes of an August 23, 2010 visit indicated that Webster had normal attention span and concentration upon physical examination. At an October 4, 2010 visit, Webster reported her neck and upper back were getting better; on examination, Dr. Critser found mild pain. At a November 17, 2010 visit, Webster reported she was only taking medication at night. On January 27, 2011, Webster had MRIs of the brain and cervical spine; they were both normal other than showing straightening of the cervical lordosis.

At a February 2, 2011, follow-up examination, Dr. Critser documented that Webster complained of difficulty with concentration, headaches, numbness and weakness. According to Dr. Critser, these problems had been ongoing since right after the accident, but he documented them at that visit because Webster's husband was concerned that she was not the same person, could not concentrate, and had problems remembering to do certain household chores.

As a result of these complaints, Dr. Critser referred Webster to Dr. Bradley Schuyler, a neuropsychologist who specializes in attention deficit disorder. He delayed referring her because it was not "really evident" that she might have an actual concentration or attention problem until some time had passed since such problems often resolve within a few months of an accident. When the problem persisted, he referred her for testing.

As of April 2012, Webster said she was still experiencing headaches, as well as neck and shoulder discomfort and pain, and continued to have problems with reading and

4.

comprehension.  Dr. Critser, who Webster continued to see, did not know how long her problems would persist.  Dr. Critser testified that all of the treatment he provided Webster was reasonable and necessary to diagnose or treat symptoms and injuries she suffered in the 2010 accident.

Webster, who was 34 years old at the time of trial, testified about traumatic events that occurred during her childhood, which included an uninvolved mother with a drug abuse problem who verbally and physically abused her; an alcoholic father; her mother's admission to a mental hospital after her mother burned down their home; living with different relatives; and her boyfriend's death when she was 17.  Webster's marriage when she was 19 ended in divorce at age 23.  When she was 27, she married a man 29 years older than her who had post-traumatic stress disorder from the Vietnam War.  Webster has two sons, one from each marriage.  She had been involved in three prior automobile accidents, one in 2000 as a passenger, the second in 2003 when she was rear-ended by another car which led to three to five months of chiropractic and physical therapy, and the third in 2004 as a passenger, for which she received six months of chiropractic care.

Webster separated from her second husband in July 2011 and her divorce was pending.  She was fearful and unhappy when they separated; Webster described her husband as "very aggressive, extremely violent, [and] very threatening[,]" after she left him.  He had been physically abusive; he pushed her with his chest and on the night she left him, he grabbed her face and shoved her backwards.  She filed for restraining orders in July and October 2011.  In court documents filed in July 2011, Webster alleged her husband was stalking her, was verbally and physically abusive, and threatened to take their son and move to Montana.  Her husband also filed for a restraining order in July 2011, claiming Webster physically abused him, used a lot of pain medication in early 2011, and used illegal drugs.  Webster denied his allegations. After their separation, her husband had an affair with her mother.

As of the date of trial, Webster and her husband shared custody of their son. While the relationship with her husband was "not wonderful," he was not bothering her as much as he used to, although he continued to text her in violation of the restraining order. At trial, Webster read the declarations she filed in support of each restraining order, which described her emotional distress, daily crying, not eating and vomiting due to the "huge amount of stress" she was under, and her constant fear, anxiety and worry over her husband's stalking and threats. Webster and her husband withdrew their July applications for restraining orders at the judge's request; the court subsequently granted the second restraining order, which was in effect until 2014. Webster agreed the events in the context of her divorce were significantly stressful and the situation did not develop overnight.

Dr. Schuyler first saw Webster on April 13, 2011. He obtained a general history from her and developed an assessment plan, which involved neuropsychological testing. Testing revealed significant problems in concentration, which he immediately treated with medication. Once her concentration was normalized, Webster performed other tests in June and August 2011. The tests showed Webster has a visual processing disorder, resulting in slowed reading fluency and difficulty with reading comprehension. In Dr. Schuyler's opinion, Webster's problems with concentration and visual processing were a result of the accident and were not attributable to emotional stressors caused by Webster's problems. Dr. Schuyler recommended she utilize "Brain Power," a cognitive rehabilitation computer program he developed and owns, to treat her visual processing problem and take a medication for her concentration problems for life. Dr. Schuyler admitted that during testing his assistant did not correctly administer validity tests, but he believed Webster's difficulty with some of them were "false positives," since her test data was "very consistent."

Defense expert Laurence Neuman, a consulting engineer with expertise in accident reconstruction, estimated the impact speed of the first crash, when Miles's car hit

6.

Webster's car, was about 15 miles per hour and the impact speed of the second crash, when Webster's car hit the truck, was 10 miles per hour. He estimated Webster's speed change, or Delta-V, as an acceleration of 10 miles per hour in the first crash and a deceleration of seven miles per hour in the second crash. He calculated the average g-force in the first crash as 4.5 g's and the second as 3.1 g's. Based in part on Neuman's numbers, defense expert Richard Robertson, Ph.D., a biomechanical consultant, opined that the force of the accident was strong enough to cause strain injuries to Webster's neck muscles and connective tissue, which he likened to having sore muscles following a workout, and possibly cause a minor sprain to the ligament structure. There was not enough force, however, to cause a brain injury.

Defense expert Dr. Errol Leifer, a clinical neuropsychologist, personally tested Webster on February 18, 2012, and reviewed her records. He did not believe the car accident caused Webster's concentration and visual processing difficulties, and he would not recommend future cognitive therapy or training because of the car accident. Dr. Leifer explained that the symptomatology Webster experienced is the kind exhibited by people who have massive brain damage, where there is either bleeding in the brain, brain tissue damage evidenced on an MRI or CT scan, or a prolonged period of unconsciousness as a result of head trauma. Dr. Leifer found Webster had a longstanding history of crippling migraines which had "all kinds of visual processing symptomatology connected with them." He also considered Webster's history of physical abuse and chaotic home life as a child, as well as the problems in her marriages, and opined those showed an extensive history of high levels of chronic stress that produce a wide variety of cognitive symptomatology.

Defense expert Dr. Kurt Miller, a neurologist who examined Webster on March 7, 2012 and reviewed her medical records, ascribed Webster's neck and trapezius muscle tenderness, and certain left shoulder complaints, to the accident. He also opined the accident could have exacerbated Webster's pre-accident headaches, although he could

not say definitively if it did or to what degree. Dr. Miller testified appropriate treatment for these injuries consisted of physical therapy, totaling 24 visits, followed by home exercise, and muscle relaxers, anti-inflammatories, or possibly antidepressants, to treat muscle pain. In his opinion, the accident did not cause Webster's brain injury or necessitate taking medication for concentration for the rest of her life.

In Dr. Miller's opinion, Webster's history of forgetfulness was "nonsensical" as the tasks she claimed to forget involved "classic over-learned procedural memory," which should not be lost. Webster's primary complaint to Dr. Miller was memory loss, which she said was new with the accident; she said she did not retain anything she read and had trouble reading a recipe. She also complained that her headaches were different than before the accident and were constant. Dr. Miller's examination found Webster to be "fairly normal." He found some tender muscles.

Dr. Miller testified the following was significant based on Webster's medical records: (1) ambulance records documented only that Webster had some soreness at the back of the head, and top of the neck and shoulders, but did not describe an altered level of consciousness, chest or back pain, or an abnormal Glasgow Coma Scale; (2) hospital records listed complaints of neck pain, upper back pain, left shoulder pain, headaches and left ear pain, but reported no head trauma or altered level of consciousness; (3) the emergency room doctor found tenderness in the trapezius, which is the top of the shoulder muscle, and the left shoulder; (4) neck x-rays taken at the hospital showed cervical straightening which could have been due to muscle spasms or positioning during the x-ray; (4) no diagnostic studies were done on Webster's head or brain at the hospital; (5) Dr. Critser's March 3, 2010 progress note documented no complaints consistent with a brain injury; and (6) Dr. Critser's records did not consistently document Webster's claimed complaints of memory and concentration issues.

Dr. Miller also opined that Dr. Schuyler's testing was unreliable because validity testing was not done correctly. Dr. Miller testified that Dr. Critser's chart contained a

8.

May 16, 2011 drug test that was positive for Oxycontin, although nothing Dr. Critser prescribed would show up as Oxycontin and the records did not show that Webster was ever prescribed Oxycontin. Inconsistent Oxycontin use could affect one's ability to function.

In rebuttal, Webster recalled two witnesses who testified in her case-in-chief, namely Dr. Critser and Linda Gourley. She also called Gary Moran, Ph.D. After Gourley's testimony, the jury submitted a written request to the court which stated: "We the jurors feel as if information presented is being repeated. We would all appreciate to conclude today!!"

Webster sought to recover $500 for a rental car, $3,644.75 for car repairs, and $17,789.27 in medical costs comprised of the following payments: $856 to American Ambulance; $2,842 to the hospital; $1,476.39 to Sierra Imaging; $1,301.30 to Jimenez Physical Therapy; $3,083.68 to Functional Integrated Therapy; $1,452.14 to Creative Therapeutics; $2,485.62 to Dr. Schuyler; $4,042.14 to Dr. Critser; and $250 for medication. She also sought unspecified damages for future economic loss in the form of future medical expenses and unspecified damages for past and future non-economic loss, including physical pain, mental suffering and neurocognitive deficits.

With respect to non-economic damages, the jury was instructed, in pertinent part: "The following are the specific items of non-economic damages claimed by Ms. Kimberly Webster: Past and future physical pain, neurocognitive deficits, mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress. [¶] No fixed standard exists for deciding the amount of these non-economic damages. You must use your judgment to decide a reasonable amount based on the evidence and your common sense. [¶] To recover for future pain, neurocognitive deficits, mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress, Ms. Webster must prove that she is reasonably

certain to suffer those harms. . . . [¶] . . . You must award only the damages that fairly compensate Kimberly Webster for her loss."

The jury was provided with a special verdict form which asked first whether Miles's negligence was a substantial factor in causing harm to Webster, and if the jury answered yes, asked them "What are Kimberly Webster's total damages caused by the March 2, 2010 accident?" During the jury's deliberations, it sent two written requests to the court. The first asked for clarification of the first question, as "some of us feel the question is asking whether there is any injury at all. Other jurors believe the question is relating to if there was brain injury." The court instructed the jury that the question related to whether there was any injury at all. The second request asked whether the jury could receive a detailed car repair bill and a description of physical therapy, particularly the body parts treated. In response, with the agreement of counsel, the court read to the jury Webster's incurred medical bills and provided written documentation of the same.

After the jury deliberated further, it informed the court it had reached a verdict. The court, however, returned the special verdict form to the jury and asked the jurors to deliberate further, as they had awarded damages for past economic loss, but awarded nothing for non-economic loss. The court instructed the jurors that if they awarded damages for economic loss, they were required to award damages for non-economic loss, and in determining the amount of non-economic loss, they were to follow the instructions previously given.

After deliberating further, the jury returned a special verdict which answered yes to the first question of whether Miles's negligence was a substantial factor in causing harm to Webster and, in the second question, awarded (1) past economic losses totaling $9,395, comprised of $5,250 for medical expenses, $3,645 for property damage, and $500 for rental car, and (2) past non-economic loss of $250. The jury awarded nothing for future economic and non-economic losses. The damages totaled $9,645. Polling of the jury revealed that 11 jurors answered the first question in the affirmative, but only

eight jurors agreed with the award of $5,250 for past medical expenses.  The court told the jury to return and deliberate further, as at least nine jurors must agree on each question.

After deliberating further, the jury again returned a special verdict; the court polled the jury after each question.  All of the jurors answered the first question in the affirmative.  The damages awarded under the second question were identical to the previous special verdict.  Nine of the jurors agreed to award $5,250 in past medical expenses.  Eleven jurors agreed to award $3,645 in past property damage.  All jurors agreed to award $500 for the rental car.  Nine jurors agreed to award $250 in past non-economic losses.  Eleven jurors agreed not to award anything for future medical expenses and non-economic losses.

### DISCUSSION

Webster seeks a new trial based on the inadequacy of non-economic damages and an inconsistent verdict.  She contends the trial court should have granted the new trial motion.

"Code of Civil Procedure section 657 states: 'A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision.'  A trial court has broad discretion in ruling on a new trial motion, and the court's exercise of discretion is accorded great deference on appeal.  (*City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871–872.)  An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice.  (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478–479; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)  Accordingly, we can reverse the denial of a new trial motion based on insufficiency of the evidence or

11.

[inadequate or] excessive damages only if there is no substantial conflict in the evidence and the evidence compels the conclusion that the motion should have been granted." (*Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 751–752.)

The amount of damages is a question of fact, "first committed to the discretion of the jury and next to the discretion of the trial judge on a motion for new trial. They see and hear the witnesses and frequently, as in this case, see the injury and the impairment that has resulted therefrom. As a result, all presumptions are in favor of the decision of the trial court [citation]. The power of the appellate court differs materially from that of the trial court in passing on this question." (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506-507.) "Basically, the question that should be decided by the appellate courts is whether or not the verdict is so out of line with reason that it shocks the conscience and necessarily implies that the verdict must have been the result of passion and prejudice." (*Id.* at p. 508; accord *Bertero, supra,* 13 Cal.3d at p. 61.)

Thus, to reverse here essentially requires a finding that damages are inadequate as a matter of law. Some courts have concluded that a verdict awarding full medical expenses to a personal injury plaintiff but awarding nothing for pain and suffering is inadequate as a matter of law when it is obvious that pain accompanied an undisputed injury for which the jury found the defendant liable. "[I]n cases where the right to recover is established, and there is also proof that the medical expenses were incurred because of defendant's negligent act, '[i]t is of course clear that in such situation a judgment for no more than the actual medical expenses occasioned by the tort would be inadequate.'" (*Dodson v. J. Pacific, Inc.* (2007) 154 Cal.App.4th 931, 938 (*Dodson*), quoting *Miller v. San Diego Gas & Elect. Co.* (1963) 212 Cal.App.2d 555, 558 (*Miller*); see also, *Wilson v. R.D. Werner Co.* (1980) 108 Cal.App.3d 878, 883 (*Wilson*); *Haskins v. Holmes* (1967) 252 Cal.App.2d 580, 584-585 (*Haskins*); *Gallentine v. Richardson* (1967) 248 Cal.App.2d 152, 155 (*Gallentine*).)

These cases, however, typically involve a failure to compensate for pain and suffering where there were *egregious* injuries of lengthy durations. (See, e.g., *Clifford v. Ruocco* (1952) 39 Cal.2d 327, 329 [plaintiff injured in car accident developed infection in her thigh, which led to unsuccessful surgery to remove adhesions and required a 24-day hospital stay]; *Dodson*, *supra*, 154 Cal.App.4th at pp. 937-938 [plaintiff underwent serious surgical procedure to remove herniated disk and replace it with a metal plate]; *Wilson*, *supra*, 108 Cal.App.3d at p. 883 [plaintiff who fractured right elbow and both wrists required surgery and physical therapy, his arms were immobilized in casts for three months, and he suffered continued pain and numbness that continued through trial]; *Haskins*, *supra*, 252 Cal.App.2d at p. 584 [fractured cheek and jaw bones causing a depressed cheek bone necessarily requiring surgery]; *Buniger v. Buniger* (1967) 249 Cal.App.2d 50, 52-53 [plaintiff's hip was broken in fall on stairs, requiring surgery and a 31-day hospital stay, and thereafter had several minor strokes; by the time of trial, she had learned to walk without assistance, but still could not do everything she could before the accident]; *Gallentine*, *supra*, 248 Cal.App.2d at p. 153 [plaintiff was shot while hunting, spent time in the hospital, took several months to heal, and never recovered the quality of health prior to the shooting].)

Courts have also cautioned that an award for the exact amount of, or even less than, the medical expenses is not necessarily inadequate as a matter of law because, in most cases, there is a conflict on a variety of factual issues, such as the cause, extent or permanency of a plaintiff's injuries. (See *Randles v. Lowry* (1970) 4 Cal.App.3d 68, 73-74; *Sherwood v. Rossini* (1968) 264 Cal.App.2d 926, 931-932; *Miller*, *supra*, 212 Cal.App.2d at p. 558.) In short, "[i]t cannot be said, however, that because a verdict is rendered for the amount of medical expenses or for a less amount the verdict is inadequate as a matter of law. Every case depends upon the facts involved. (*Miller*, *supra*, 212 Cal.App.2d at p. 558.)

Here, Miles conceded liability. The jury necessarily found Webster was injured because it awarded medical expenses as part of economic damages. There was conflicting evidence as to which of Webster's medical problems – namely, her neurocognitive deficits, worsened headaches, and neck and shoulder pain – were attributable to the accident. Dr. Critser testified that the accident caused all of these problems. Defense experts, however, opined that the force of the accident was only strong enough to cause muscle strains, not brain injuries, and therefore the only injuries attributable to the accident were muscle tenderness and perhaps worsened headaches. By awarding less than the full amount of the medical expenses requested, the jury necessarily agreed with the defense experts, finding that not all of Webster's medical problems were caused by the accident.

Webster asserts it is a "mystery" how the jury calculated the sum of $5,250 in past medical expenses. As Webster acknowledges, the jury's award of $5,250 is close to the nearly $5,000 defense counsel asked the jury to award for medical treatment, which defense counsel asserted was comprised of the ambulance bill, hospital emergency room bill, and first round of physical therapy with Jimenez Physical Therapy. Webster argues there is no evidence to support such an award. We disagree. Dr. Miller attributed nothing more than muscle strains to the accident, which he opined could be treated with 24 physical therapy visits, home exercise and muscle relaxants or anti-inflammatories. Dr. Miller could not conclusively relate an exacerbation of headaches to the accident. Based on Dr. Miller's testimony, the jury reasonably could conclude that the accident only caused Webster to suffer soft-tissue injuries that could be treated with a six month course of physical therapy and some medication, thereby entitling her to damages only for the initial medical treatment and first round of physical therapy.

The $250 the jury awarded for past pain and suffering is not out of line with the past medical expenses awarded. By awarding only $5,250 in medical expenses, the jury necessarily rejected Webster's claim that her neurocognitive deficits were attributable to

the accident. Based on the evidence, the jury reasonably could find this was a low-impact accident that resulted only in minor muscle strains, and that while Webster was entitled to recover the cost to treat those strains, she did not suffer any significant physical pain or mental suffering as a result of them and therefore was entitled to only a nominal amount of damages for pain and suffering. There was evidence that Webster's neurocognitive deficits and emotional problems were unrelated to the accident; from this evidence, the jury reasonably could conclude that the majority of her past pain and suffering is unrelated to the accident.

Webster argues the damage award must have been the result of passion and prejudice because the jury's note that it wanted the trial to end that day showed the jury wanted to reach a verdict quickly. Webster argues the jurors "abdicated their responsibility because they wanted the case over." But there is nothing in the record to suggest that the jurors either failed to deliberate or rushed their deliberations. In fact, their deliberations carried over from the day they sent the note to the following day.

Webster also argues Dr. Miller prejudiced the jury by violating in limine orders when he called Webster a liar and insinuated she used street drugs. On cross-examination, Dr. Miller testified it was not physiologically possible that Webster forgot to feed her children, or forgot how to do dishes or mash potatoes, as those are overlearned processes that one does not lose. Webster's attorney asked Dr. Miller to assume it was true that Webster's aunt, Linda Gourley, testified that in her personal observation, Webster was having problems with sequencing and not knowing what to do, noting that on one occasion she walked Webster through how to make mashed potatoes; Webster's attorney then asked Dr. Miller what he made of that. Dr. Miller responded, "[t]hat's a lie." He explained that making mashed potatoes is an overlearned skill that one could not lose without having other tremendous deficits, and stated that it was either a "false tale" or an exaggeration. Webster's attorney asked Dr. Miller if he was saying that Gourley lied during her testimony. Dr. Miller responded: "That would be correct. That story

15.

does not reflect the physiological process. So that story is not true. It is false, and falsehoods are generally called 'lies.'" Webster's attorney again asked Dr. Miller if his testimony was that Gourley must have been lying. Dr. Miller responded that she could have been lied to. Webster's attorney later asked Dr. Miller if Webster was lying when she testified about the "weird problems" she had following the accident. Dr. Miller responded, "Those are not physiological true phenomena. She cannot have that. So if she is saying that, those are not true. Losing this overlearned stuff is a lie, that would not be true. Whether it's a lie or an exaggeration or however you want to claim it or describe it, those are not true. . . . like I don't lose the ability to handwrite. That's the same kind of thing. [¶] To say, 'I forgot how to make mashed potatoes,' or 'I don't know how to put things in the dishwasher,' is just not believable. People don't lose that."

Noting that Dr. Miller had used the term "street drugs" in his testimony, Webster's attorney asked Dr. Miller if he saw anything in Webster's medical records to indicate she had used any kind of street drugs. Dr. Miller responded, "Does that open the door in real life?" At that point, the court asked the jury to leave the courtroom so it could confer with counsel. The court noted that three of plaintiff's in limine motions pertained to the exclusion of testimony regarding Webster's use of other drugs, which the court deferred ruling on and under which the question at issue might fall. After the court allowed Webster's attorney to voir dire Dr. Miller, the attorney decided not to withdraw the question. Dr. Miller then testified the only reference in the medical records to "illegal" or "street drugs" was a May 24, 2010 reference in Dr. Critser's records to a statement Webster made to Dr. Critser that she knew cannabis may help with extreme pain.

Contrary to Webster's assertion, Dr. Miller's testimony did not present evidence that suggests passion or prejudice by the jury. Although Webster vehemently protests that the testimony violated in limine orders, whether it did so is irrelevant to this analysis because the jury was not aware of the in limine orders. Instead, the issue is whether Dr. Miller's testimony suggests the jury's award was born of passion or prejudice. We

16.

do not find the testimony so shocking that it would inflame the jury against her. While Dr. Miller did testify Webster was lying, he also testified she might have been exaggerating. He did not testify that Webster used street drugs. Instead, he testified that she asked her doctor about medical marijuana. Given the other evidence in this case supporting the jury's award, we cannot say that the testimony Webster points to shows the jury's verdict must have been the result of passion and prejudice.

Webster next contends her neurocognitive deficits were reasonably connected to the accident. In making this argument, she essentially asks us to reject the testimony of the defense experts and adopt her doctor's opinions. As the trier of fact, however, the jury was free to accept the opinions of the defense experts and reject her expert's opinions. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 204 ["'resolution of conflicts in the evidence, assessment of the credibility of witnesses and the weight to be given the opinions of experts were all matters within the exclusive province of the trier of fact.'"]

Grasping onto testimony by Dr. Leifer on cross-examination that Webster had "a vulnerability" to neurocognitive deficits, which she claims is his "true opinion," Webster argues that the deficits were "in fact causally related to [the] accident" because the "deficit's actual symptoms were triggered by the effect of the accident on that vulnerability." She claims this is analogous to the workers' compensation principle that a preexisting condition "which is 'lighted up' by the subject injury is deemed causally related to the subject injury," citing *Sidders v. Workers' Comp. Appeals Bd.* (1988) 205 Cal.App.3d 613, 627, and *Bstandig v. Workers' Comp. Appeals Bd.* (1977) 68 Cal.App.3d 988, 997.) She further asserts the situation could be viewed as an aggravation of a preexisting condition, which places the burden on the defendant to prove the extent of damages resulting from the defendant's conduct, citing *Stone v. Foster* (1980) 106 Cal.App.3d 334, 347-348.)

First, it does not appear that this argument was raised below. Issues not raised in the trial court ordinarily will not be considered on appeal. (*In re Marriage of Modnick* (1983) 33 Cal.3d 897, 913, fn. 15.) Even if not forfeited, the argument is premised on a misreading of Dr. Leifer's testimony. When asked on cross-examination if it was his opinion that Webster's neurocognitive deficit was something she had before the accident, Dr. Leifer responded, "That she had a vulnerability to it, if not had it before." Webster's counsel next asked if he was "saying she had it before but just didn't know she had it?" Dr. Leifer answered, "No. I'm saying that she may have had it and didn't accurately report that she had it, or she's vulnerable to it in the moments of acute disruption of stress." Dr. Leifer confirmed "moments of stress" are things that will trigger it. Dr. Leifer never testified that the accident in question was something that would trigger the deficit. Instead, he identified the triggering events as Webster's extensive history of high levels of chronic stress and specifically testified the accident was not the triggering event because there was nothing in Webster's medical records to base a finding of brain impairment from the accident and her complaints did not present as following from the accident.

Finally, Webster contends the verdict was internally inconsistent because the jury awarded medical special damages but awarded a nominal $250 for non-economic damages. Webster argues that by awarding $5,250 for medical specials, the jury implicitly found a fairly significant injury had been suffered and the general damage finding is inconsistent with that implicit determination. The case she relies on, however, has nothing to do with the issue in the present case, as it deals with inconsistent verdicts involving two plaintiffs. (*Morris v. McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 970-971.) As we have already explained, the verdict here was entirely consistent with the evidence and within the jury's power to award. Accordingly, the trial court did not err in denying the motion for new trial.

18.

## **DISPOSITION**

The judgment is affirmed.  Costs on appeal are awarded to respondent.


_____
                                                                                    Gomes, J.

WE CONCUR:


_____
Cornell, Acting P.J.


_____
Kane, J.

19.